NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0340n.06

No. 12-5314

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

FILED

*Apr 05, 2013*

DEBORAH S. HUNT, Clerk

MARY HEDGEPATH,

      Plaintiff-Appellee,

v.

HARVEY PELPHREY, *et al.*

      Defendants-Appellants.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

_____ /

Before:      CLAY, COOK, and ROTH,[*] Circuit Judges.

      JANE R. ROTH, Circuit Judge.

## I.      Introduction

Shannon Reed died of a drug overdose while in custody at the Three Forks Regional Jail in Beattyville, Kentucky. Reed's mother, Mary Hedgepath, brought suit on Reed's behalf against nine Three Forks employees, who were allegedly responsible for Reed's care. Three of these employees were supervisors at Three Forks: Harvey Pelphrey, the Administrator; Keith Combs, the Chief of Security; and Alex Neely, a captain (collectively, Supervisory Jailers). The remaining six were jailers on duty at the jail on the day Reed died: Debbie Alexander, Brittany Lumpkins, Rick Smyth, Zach Fraley, Shon Sebastian (collectively, Deputy Jailers), and Varian Rowland. All nine defendants challenge the District Court's denial of their motions for summary judgment on qualified immunity grounds. For the reasons that follow, the judgment of the district court is affirmed as to

_____

[*] The Honorable Jane R. Roth, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

the Supervisory and Deputy Jailers. Because Rowland disputes the facts alleged by plaintiff concerning his booking of Reed, Rowland's appeal of the denial of qualified immunity as to him is dismissed for lack of appellate jurisdiction.

## II.    Background

### A.  Reed's Detention at Three Forks

At approximately 3 a.m. on September 29, 2008, Reed was arrested on drug charges after being found slumped over in his companion's car. Reed was taken to a local police station for processing and then transported to Three Forks. Rowland, Smyth, and Lumpkins were on duty when Reed arrived at Three Forks at approximately 6 a.m. Rowland was the shift supervisor and was responsible for booking Reed at the facility. Rowland testified that Reed looked tired but he attributed Reed's state to the early morning hour and the fact that Reed had been up all night. Rowland also recalled observing Reed fall asleep on a bench in the booking area.

Smyth was responsible for strip-searching Reed, a standard practice for all persons being held on drug charges. About ten minutes after Reed arrived at Three Forks, Smyth instructed Reed to proceed to a shower cell, where the search was conducted. Reed walked to the room and undressed without assistance. Reed was lucid enough to tell Smyth during the search that he had done nothing wrong and was just trying to sleep when he was arrested. Even though Reed was a bit unsteady on his feet, he was able to dress himself in jail-issued clothing and leave the shower cell on his own power. Smyth testified that he observed no signs suggesting that Reed might have a medical problem. Smyth also recalled that Reed appeared sleepy but believed that Reed was in that state due to fatigue.

After the search, Reed returned to the booking area, where he retrieved a mat to sleep on. At approximately 6:30 a.m., Smyth moved Reed to an observation cell as required by the jail's policy mandating that all intoxicated detainees be placed in special holding cells and that those detainees be observed every twenty minutes to make sure that they are conscious and do not need medical attention. Soon thereafter, Smyth heard Reed snoring loudly enough to be heard outside of the cell. Later that morning, Smyth looked into Reed's cell and saw Reed breathing and changing positions on the mat.

As part of the booking process and as required by jail policies, Rowland was responsible for obtaining background information about Reed. Rowland also was assigned the task of asking Reed questions from a standard medical screening form and obtaining Reed's signature on his booking documents. Rowland apparently failed to performed either task, although the reason why is unclear. On the booking documents, Rowland wrote that Reed was "too high to sign." At his deposition, however, Rowland testified that he did not know whether Reed was actually too high to sign. Rowland testified that the reason he did not ask Reed the screening questions was because Reed had already fallen asleep in the observation cell. Rowland also said that he believed that Reed would have been able to answer the questions and sign the documents if Rowland had roused Reed and asked him to do so.

Lumpkins, a recent hire at the jail, was assigned to a different part of the jail that night but she went to the booking area when Reed arrived at the jail to learn how the booking process worked. Lumpkins observed Reed speaking and subsequently heard him snoring in his cell. Lumpkins testified that she did not think that Reed was too high to sign his booking paperwork.

At 7:00 a.m., Alexander, Fraley, and Sebastian relieved Rowland, Smyth, and Lumpkins pursuant to a regularly scheduled shift change. Rowland informed Alexander, the morning shift supervisor, that Reed was in custody and that he was high. When Alexander checked on Reed at approximately 7 a.m., Reed was breathing and snoring.

At approximately 8 a.m., Fraley entered Reed's cell to take him to an interview with pretrial services. Fraley called Reed's name two or three times, but Reed did not respond. Fraley did not attempt to wake Reed because the pretrial services officer said that Reed could be interviewed later in the day.

Sebastian was responsible for checking on the inmates in observation cells every twenty minutes to ensure that they were conscious and that none of them needed medical assistance. Sebastian performed the check by looking through a window in the cell door, tapping on the glass, and seeing whether the inmate responded. A surveillance log indicates that someone—although the log does not indicate who—checked on Reed seven times between 7:11 a.m. and 9:15 a.m. The log states that Reed was "OK" in each instance. At his deposition, Sebastian clarified that "OK" meant that the detainee was "breathing and all right."

Neely was the ranking officer at Three Forks during the morning shift. However, Neely, the Captain of Internal Affairs, was not involved in supervising detainee-related matters because he was conducting an investigation. Still, Neely was aware of Reed's presence in the jail because he heard Reed snoring at around 7 a.m.

At approximately 9:19 a.m., Alexander entered Reed's cell to wake him for his arraignment. Alexander repeatedly asked Reed to wake up, but he was unresponsive. Neely heard Alexander telling Reed to wake up and went to Reed's cell to see if he could assist. Neely observed that Reed

had no pulse, although his body was warm to the touch and his skin was a normal color. Neely then initiated an emergency medical response but Reed could not be revived. Reed's autopsy report stated that he died of a drug overdose.

### B. Procedural Posture

Hedgepath filed suit in the Eastern District of Kentucky on behalf of Reed, asserting violations of federal and Kentucky law. The federal claims alleged violations of the Eighth, Tenth, and Fourteenth Amendments to the United States Constitution. The Kentucky law claims alleged the common law torts of negligence, gross negligence, and outrage. The district court dismissed Hedgepath's federal claims on summary judgment but retained supplemental jurisdiction over the Kentucky law claims. The district court denied the defendants' supplemental motion seeking summary judgment on qualified immunity grounds, which defendants now appeal to this Court.

## III.  Discussion[1]

As discussed below, we lack appellate jurisdiction over Rowland's claim of qualified immunity because he raises factual issues outside the scope of our review on this appeal. As to the remaining defendants, the district court correctly denied them qualified immunity because their duties were ministerial under Kentucky law.

### A. Legal Framework

#### 1. Appellate Jurisdiction

A defendant who is denied qualified immunity may file an interlocutory appeal only if the appeal involves an "abstract or pure legal issue." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir.

---

[1] The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 and 42 U.S.C. § 1983. This Court reviews the denial of qualified immunity *de novo*. *Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2003).

1998) (citation omitted). "If the defendant does not dispute the facts alleged by the plaintiff for purposes of the appeal, our jurisdiction is clear." *Id*. (citation and internal quotation marks omitted). However, if the defendant disputes the plaintiff's version of the story, the defendant must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal. *Id.* "Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal." *Id.*

### 2. Qualified Immunity

"The law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Lamb v. Clark*, 138 S.W.2d 350, 352 (Ky. 1940). Qualified immunity under Kentucky law shields public employees from tort liability so long as the employee was performing "(1) discretionary acts or functions . . .; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). Whether a policy is ministerial or discretionary is a question of law. *Yanero*, 65 S.W.3d at 521–22.

Discretionary duties involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment[.]" *Id.* at 522 (citation omitted). "Discretion in the manner of the performance of an act arises when the act may be performed in one or [sic] two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959) (citation omitted). On the other hand, ministerial duties require "only obedience to the

orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522 (citation omitted).

"In reality, few acts are ever purely discretionary or purely ministerial." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010). "[T]hat a necessity may exist for the ascertainment of . . . facts does not operate to convert the act into one discretionary in its nature." *Upchurch*, 330 S.W.2d at 430. Thus, "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Yanero*, 65 S.W.3d at 522 (citation omitted). Consequently, the determination of whether a particular act is discretionary or ministerial focuses on the "*dominant* nature of the act" and is inherently fact-sensitive. *Haney*, 311 S.W.3d at 240. For example, a police officer responding to an emergency call from another trooper is a ministerial act, even though the officer might need to exercise some judgment while racing to the scene. *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky. 2004). Similarly, the inspection of drainage culverts to assure that they conform to state regulations is a ministerial duty because it "does not require any significant judgment, statutory interpretation, or policy-making decisions." *Collins v. Commonwealth of Ky. Natural Res. & Envtl. Protection Cabinet*, 10 S.W.3d 122, 126 (Ky. 1999).

On the other hand, the Kentucky Supreme Court has held that the supervision of prisoners in a prison work program was a discretionary activity that entitled an officer to qualified immunity after an inmate was injured in a worksite accident. The inmate claimed that the guard was negligent in his oversight of the work crew. *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 479–80 (Ky. 2006). In *Sloas*, the Supreme Court of Kentucky held that qualified immunity was appropriate because the officer had to use his judgment to not only prevent escape, but also to "correct [the prisoners] as

necessary, determine their capabilities, sometimes by asking them forthright whether they can or can't do the job, assign the duties and see that the work is performed." *Id.* at 480. Similarly, the Kentucky Supreme Court held that instructions that a camp supervisor ensure that campers stayed in the middle of the path during a night hike implicated a discretionary function because the counselor had "a general and continuing supervisory duty to keep the children on the middle of the path which depended on constantly changing circumstances[.]" *Haney*, 311 S.W.3d at 243.

### B. Analysis

#### 1. Rowland

It was Rowland who booked Reed. The district court held that any actions or omissions by Rowland relating to the administration of Three Forks' admission policy were ministerial. Rowland challenges this finding, arguing that he believed that Reed fell into one of the exceptions to the jail's policy concerning intoxicated detainees. Rowland further argues that the evidence showing that Reed could walk, speak, and follow instructions necessarily affects the qualified immunity analysis. However, what Rowland felt, what the jail's policy required, and what actions Reed was or was not capable of are factual questions that this Court lacks jurisdiction to resolve at this stage. Consequently, his appeal is dismissed.

#### 2. The Deputy Jailers

The Deputy Jailers assert that the jail's policy triggered a discretionary function because the manner in which the supervision of detainees was to be performed was left to the discretion of each individual employee. We disagree with the Deputy Jailers' view and will affirm the judgment of the district court.

The distinction between cases like *Haney* and *Sloas*, which focus on the discretionary duty to anticipate prospective harm, and cases like *Yanero* and *Jones*, which focus on the ministerial duty to follow instructions, is critical to the analysis in this case. Ultimately, this is not a case where the Deputy Jailers had to adjust to an unpredictable scenario that they were charged to deal with at their discretion. *Cf. Haney*, 311 S.W.3d at 243; *Sloas*, 201 S.W.3d at 479–80. Instead, this case involves a relatively straightforward policy with unambiguous instructions. In the same way that a police officer's use of judgment when driving a car to the scene of an emergency did not render the act discretionary, *Jones*, 150 S.W.3d at 50, the Deputy Jailers' use of judgment to ascertain consciousness here is similarly not discretionary. Dictum from the Kentucky Supreme Court's decision in *Haney*, where a camp counselor's duty to keep children safe during a night hike was held to be a discretionary function, is particularly instructive: if the camp had imposed a requirement on the counselor to perform specific actions to keep students safe, then that mandate likely would have transformed the counselor's duty into a ministerial one. *Haney*, 311 S.W.3d at 243. Here, we have the type of mandate absent in *Haney*: the Deputy Jailers were required to ensure the safety of intoxicated detainees by checking on them every twenty minutes to make sure they were conscious.[2] *See* 501 Ky. Admin. Regs. 3:060 § 2(3); *see also* (R. 141-1, at PID# 1936) (Pursuant to jail policy, jail staff "will immediately initiate the Medical Emergency Response Plan" if one of the listed conditions, including "[u]nconsciousness," is present.).

---

[2] To the extent that the Deputy Jailers assert that the policy does not apply to them, question the timing of when Reed became unconscious, or dispute the District Court's findings on the terms of the jail's policy on unconscious inmates, these are factual issues that cannot be resolved at this stage of the litigation.

In an attempt to distinguish cases like *Haney* and *Sloas*, the Deputy Jailers cite to *Jerauld v. Kroger*, where jail authorities were placed on notice that Jerauld might do something to hurt himself while in police custody, but the jail authorities were still entitled to qualified immunity. 353 S.W.3d 636, 638–39 (Ky. Ct. App. 2011). In that case, Jerauld was initially placed on suicide watch, but jail employees re-evaluated him and decided that he could be taken off suicide watch. *Id.* Two days later, Jerauld attempted suicide. *Id.* The Kentucky Court of Appeals held that the employees' actions were discretionary because they had to make judgments about Jerauld's condition and evaluate whether he was actually at risk for suicide. *Id.* at 641–42. Although the employees were ultimately wrong, the discretionary nature of their duties entitled them to qualified immunity. *Id.* Appellants' citation to *Jerauld* is inapposite because that case involved discretionary medical evaluations and nothing more. Here, however, the Deputy Jailers' duty was not to make a subjective medical determination, but instead required them to undertake a simple, straightforward assignment: check to see if Reed was conscious or unconscious.

Although the Deputy Jailers are correct that their duty necessarily involved some exercise in judgment, it is an insufficient amount to characterize their duty as discretionary because whether an individual is unconscious—as opposed to sleeping or dead—is an objective factual question that can be resolved by, for example, attempting to wake the individual. The execution of this duty did not require the type of "personal deliberation, decision, and judgment" needed to render it discretionary. *Yanero*, 65 S.W.3d at 522. In sum, the Deputy Jailers were given a simple instruction: check on the status of all detainees placed in observation cells every twenty minutes to make sure they are not unconscious. This is "an essentially objective and binary directive," *Haney*, 311 S.W.3d at 242, and does not "require any significant judgment, statutory interpretation,

or policy-making decisions," *Collins*, 10 S.W.3d at 126. Therefore, the duty is ministerial, and the Deputy Jailers are not entitled to qualified immunity.

### 3. The Supervisory Jailers

The district court held that the Supervisory Jailers had a ministerial duty to enforce existing jail policies and therefore were not entitled to qualified immunity on either a failure to train theory or a negligent supervision theory. This Court has appellate jurisdiction over the discrete question of whether the supervision of employees and the training of employees is a ministerial or discretionary function.[3] These legal questions are well-settled. As to training, although deciding on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function. *See Yanero*, 65 S.W.3d at 529. Hedgepath's claim is that the contents of the policy were decided and that the Supervisory Jailers simply failed to train the jailers on how to comply with those policies. Because this claim implicates a ministerial duty, the District Court's denial of qualified immunity will be affirmed. With respect to the negligent supervision claim, the supervision of employees is a ministerial act when it merely involves enforcing known policies. *See Yanero*, 65 S.W.3d at 522. Hedgepath claims that the Supervisory Jailers did not enforce known policies. Consequently, the Supervisory

---

[3] We lack jurisdiction to consider the factual issues raised by the Supervisory Jailers. For example, the Supervisory Jailers note the lack of evidence indicating that they ever permitted unlawful practices at the jail, and consequently assert that they cannot face liability under a failure-to-train theory. The Supervisory Jailers also point to the apparently undisputed fact that Pelphrey and Combs were not in the jail at the time of the incident, and thus argue that Hedgepath's negligent supervision claim must fail. Even if true, these are factual questions about liability, not legal questions about the whether the Supervisory Jailers are entitled to qualified immunity, and are therefore outside of this Court's jurisdiction in this appeal.

Jailers are not entitled to qualified immunity because their duty to supervise the Deputy Jailers was ministerial.

### III.    Conclusion

For the foregoing reasons, we dismiss Rowland's appeal for lack of appellate jurisdiction and affirm the district court's decision, denying qualified immunity to the Supervisory and Deputy Jailers.