RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHNEY E. FINN, Administrator of the Estate of
Shannon Ray Finn, deceased; SANDRA RODDY,
Guardian of S.N.F., J.W.F., and G.R.F., minor
children of Shannon Ray Finn, deceased,

Plaintiffs-Appellants,

v.

WARREN COUNTY, KENTUCKY, et al.,

Defendants-Appellees.

No. 13-6629

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:10-cv-00016—Joseph H. McKinley, Jr., Chief District Judge.

Argued: July 31, 2014

Decided and Filed: September 16, 2014

Before: CLAY and STRANCH, Circuit Judges; BLACK, District Judge.[*]

---

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEYBATHURST ATTORNEYS, Prospect, Kentucky,
for Appellants. Charles E. English, Jr., ENGLISH, LUCAS, PRIEST & OWSLEY, LLP,
Bowling Green, Kentucky, for Appellees. **ON BRIEF:** Gregory A. Belzley,
BELZLEYBATHURST ATTORNEYS, Prospect, Kentucky, for Appellants. Charles E. English,
Jr., Aaron D. Smith, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green,
Kentucky, for Appellees.

---

[*]The Honorable Timothy Black, United States District Judge for the Southern District of Ohio, sitting by
designation.

1

---

**OPINION**

---

STRANCH, Circuit Judge.   Shannon Ray Finn died in his cell at the Warren County Regional Jail in Bowling Green, Kentucky, on March 20, 2009, during the course of alcohol withdrawal.  Johney E. Finn, as administrator of Finn's estate, and Sandra Roddy, as guardian of Finn's three minor children, filed suit under 42 U.S.C. § 1983 against Warren County, Warren County Regional Jailer Jackie Strode, six deputy jailers, Southern Health Partners, Inc. (SHP), SHP Medical Director Dr. John Adams, and two SHP nurses.  The plaintiffs asserted a violation of Finn's Eighth and Fourteenth Amendment rights to receive adequate medical care while incarcerated, as well as state-law claims for negligence, gross negligence, and outrage.  After some of the parties and claims were dismissed on summary judgment, a jury returned verdicts for the defendants on the remaining claims.

The plaintiffs now appeal various rulings of the district court.  For the reasons explained below, we REVERSE the grant of summary judgment to Jailer Jackie Strode and remand for a trial of plaintiffs' negligence claims against him.  We AFFIRM on all other grounds.

**I.  FACTS**

Shannon Finn entered the Warren County Regional Jail as a pretrial detainee shortly after 2:00 p.m. on March 17, 2009, following his arrest on a parole violation.  During the booking process, Finn denied that he had ever experienced delirium tremens ("DTs") or other serious withdrawal from drugs or alcohol.  He also denied that he had any serious medical condition that might require medical attention.

After admission to the jail, Finn exhibited the symptoms of alcohol withdrawal.  SHP medical staff instituted an alcohol detoxification protocol and administered oral medications to Finn every twelve hours.

On the late afternoon of March 19, a nurse assessed Finn's condition and documented her findings that Finn was experiencing weakness, restlessness, sweating, shakiness, muscle

twitching, anxiety, and unsteady gait. He was not drowsy, nauseated, or confused, and he did not exhibit any symptoms of delirium, hallucinations, or profuse sweating. The nurse determined that Finn did not require transportation to a hospital for emergency care.

Later that night, around 11:00 p.m., Deputy Jailer Chad Whitaker found Finn kicking his cell door. Finn was confused, shaking heavily, and sweating profusely. He picked at the glass in his cell door window and asked Whitaker to remove the window so that he could get out. Based on Finn's appearance and behavior and due to his own lack of knowledge about when alcohol withdrawal becomes life-threatening, Whitaker escorted Finn to the medical clinic at approximately 11:30 p.m.

SHP nurse Leah Price, LPN, evaluated Finn. She noticed shaking, muscle twitching, sweating, and problems with gait. Finn was alert, and his vital signs were within normal range. He denied drowsiness, nausea, and vomiting, and Price did not notice any confusion or slurred speech. Finn told her he felt restless and weak, he could not sleep, and he felt achy. She asked if he had received his medication, and he replied that he had. Price recognized that Finn was going through "DTs." In an effort to calm his anxiety, she offered to have the jailers transfer him to a medical observation cell near her office where the jailers could monitor him every fifteen minutes. Finn declined, stating that he was afraid and he wanted to remain in a general population cell with other inmates because he did not want to be alone.

By the early morning hours of March 20, Finn's symptoms worsened and he became delusional. When his cellmates asked questions, Finn gave "out-of-the ballpark" answers. He asked the guards if he could go out to Minit Mart for cigarettes. He thought he saw his girlfriend walking around the pod outside the cell and he tried to reach her. One inmate described Finn as "talking in tongues"; he was babbling like a baby talking gibberish. His skin was very red, yet he was cold and sweating.

Worried about Finn's condition and their own well-being, the cellmates threw objects at the speaker in the top of the cell to activate the intercom to get the guards' attention. The cellmates reported to the guards ten to fifteen times that something was wrong with Finn and he needed to be taken to the hospital because he was at obvious risk of serious harm. According to the inmates, the guards ignored their pleas for help and turned off their television.

Captain William Baker, the senior supervisor on the night shift, knew that Finn had been placed on the alcohol detoxification protocol. Around 4:30 a.m. on March 20, Captain Baker and Deputy Jailer Whitaker heard banging coming from Finn's cell. According to Captain Baker's incident report, they opened the door to find Finn shaking, sweating profusely, and "very delirious." Captain Baker moved Finn to a medical observation cell and contacted nurse Price. He told her that Finn had been kicking his cell door, he was very delirious and acting abnormally, and he had been moved to a medical observation cell. Captain Baker testified that he checked on Finn several times. He claimed he entered the observation cell and encouraged Finn to walk over to the sink to drink water, although he did not do this the last two times he checked on Finn. The jail's observation log showed, however, that Captain Baker checked on Finn only twice: at 5:27 a.m. and at 6:28 a.m. He wrote on the log each time, "appears to be okay."

Nurse Price claimed that she assessed Finn at 4:30 a.m. and 6:20 a.m. on March 20. Finn showed "no signs of distress," his vital signs were in "the normal range for him," and his condition had not changed since the last time she saw him at 11:30 p.m. on March 19. She denied that Finn was delirious or that there was a medical emergency on the morning of March 20. She admitted, however, that she did not document either of these early morning assessments. She also conceded that Captain Baker told her he had moved Finn to a medical observation cell, but she claimed that Captain Baker did not tell her that Finn was "very delirious."

Around 6:45 a.m., Price gave a report to the LPN relieving her on the dayshift, Cheryl Wilson. Price told Wilson that Finn's vital signs were within normal range, his vitals had remained about the same throughout the night, Finn was sitting up and talking to her coherently, and he answered all of her questions properly, but he had had a rough night, he did not sleep, he stated he did not feel well, and his symptoms were shakiness, weakness, and anxiety. Price, Captain Baker and Deputy Jailer Whitaker left the jail between 7:00 and 7:30 a.m. They were replaced by Captain Greg Martin, Deputy Jailers Maxwell and White, and nurse Wilson. Captain Martin testified that Captain Baker told him he placed Finn in a medical observation cell because Finn caused a scene by kicking his cell door.

During the morning hours, nurse Wilson did not check on Finn. Captain Martin did not discuss Finn's condition with nurse Wilson, nor did he inform any of the deputy jailers why Finn was in the medical observation cell. Captain Martin checked on Finn at 7:28 a.m. without opening the cell door and wrote on the observation log, "appears to be okay." He testified it was customary for jailers to make that notation on the log because the phrase refers to all cells in the area.

At 9:56 a.m., Deputy Jailer Maxwell observed that Finn was on his knees with his hands on his face, shaking and mumbling. Maxwell did not enter the cell, but he asked Deputy Jailer White why Finn was in the observation cell. White replied that Finn was detoxing and the medical staff was treating him. Maxwell did not think Finn's behavior was unusual and he decided there was no reason to contact the medical staff. He wrote on the observation log, "appears to be okay," a phrase he claimed the jailers used to indicate that the inmates were still moving around and breathing.

At 10:41 a.m., Deputy Jailer White asked Captain Martin to come to Finn's cell with the key to open the door. Captain Martin found Finn in a kneeling position on the floor with his feet behind him, his head between his knees, and a large puddle of blood and yellow liquid in front of him and between his legs. Captain Martin called Deputy Jailer Derrick Sanders for assistance, but Sanders could not find a pulse, and Finn was not conscious or breathing. When nurse Wilson arrived, she pulled Finn on his back to start CPR until the Medical Center EMS unit arrived. Finn could not be revived. Although Finn was found dead in his cell, Deputy White entered on the observation log for the 10:41 cell check, "appears to be okay."

After conducting an autopsy, the medical examiner concluded: "Death in this 34 year old, white male, Shannon Finn is attributed to Delirium Tremens arising as a result of ethanol withdrawal in the setting of chronic ethanolism. Despite initiation of appropriate treatment, death is known to occur." R. 117-10. The autopsy revealed that Finn had hypertensive cardiovascular disease with left ventricular hypertrophy.

Dr. John Adams, SHP Medical Director, did not examine Finn at any time before his death. Dr. Adams did not know that Finn was confined in the jail until he learned that Finn was dead.

The Warren County Regional Jail, which is the sixth largest jail in Kentucky, houses an average of five hundred to six hundred inmates. SHP provides medical services for inmates through a contract with the county. SHP hired Dr. Adams to supervise SHP medical staff assigned to the jail, formulate treatment protocols, and treat inmates. Although SHP initially asked Dr. Adams to visit the jail once each week, SHP acceded to his request to send a nurse practitioner to the jail once a week. Dr. Adams visited the jail once every six to eight weeks, but he was on call twenty-four hours a day, seven days a week.

At trial, the parties presented the testimony of medical experts who expressed contradictory opinions concerning whether Finn received proper medical care, whether the alcohol withdrawal treatment protocol written by Dr. Adams provided for appropriate medical care, and whether Finn's life could have been saved if he had been transported to a hospital. While plaintiffs' medical expert opined that Finn would have lived if he had received emergency medical treatment at a hospital, defendants' medical expert testified that Finn died of a congenital heart condition and nothing the jailers did or could have done would have saved Finn's life. The parties also presented the testimony of jail experts who offered different opinions on whether the jail's written Emergency Medical Services Policy (EMS) was adequate and whether the deputy jailers followed the EMS policy.

Warren County Jailer Jackie Strode testified that jail policy prohibits admission of an arrestee to the jail if that person appears to be experiencing an emergency medical condition. Because the jail's EMS policy defines an emergency as "drug or alcohol withdrawal," Strode confirmed that Finn would not have been admitted to the jail if he had shown any symptoms of alcohol withdrawal at the time he was booked into the jail. The arresting officer would have taken Finn to a nearby medical facility for treatment before he was admitted to the jail.

Jailer Strode further testified that deputy jailers receive first aid training, CPR training, and one hour of medical training as part of their mandatory sixteen hours of basic training at the Department of Corrections. Deputy jailers also participate in orientation at the jail for four weeks and receive continuous on-the-job training. Jailer Strode explained that he does not want the deputy jailers to make medical judgments so he wrote the EMS policy to outline simply and clearly the jailers' responsibilities. Although the written EMS policy requires jailers to take

particular actions in a medical emergency—and alcohol withdrawal is defined in the policy as a medical emergency—Strode repeatedly testified that the jailers were obligated only to report the medical emergency to SHP medical staff, and the medical staff had the responsibility to decide whether to transport the inmate to a hospital.

After Finn's death and an investigation by the Kentucky State Police, Jailer Strode did not re-train the deputy jailers on the EMS policy or discipline any of them for their conduct relating to Finn's care because he thought the deputy jailers did nothing wrong. Dr. Adams taught a refresher course for SHP staff on the subject of alcohol withdrawal. Strode participated in the class, but he did not require the deputy jailers to attend. Strode told the jury, "[W]hat I've learned from this is that the policy I had in place, I did a poor job of trying to convey that, trying to write that out, and I will take the blame for that, that it was a poor job of putting down instructions." R. 209 Page ID 2662.

## II. ANALYSIS

The plaintiffs raise five issues for our consideration: (1) the district court erred by not entering judgment as a matter of law against the deputy jailers on the claims of negligence and gross negligence; (2) Warren County's failure to train the deputy jailers on the EMS policy constituted deliberate indifference as a matter of law; (3) the district court erred by summarily dismissing plaintiffs' negligence claims against Jailer Strode on the ground of qualified official immunity; (4) the district court erred in allowing Dr. Alan Weder, defendants' medical expert, to testify; and (5) the compound interrogatories submitted to the jury preclude any proper evaluation of the effect of these errors on the jury's verdict. We turn first to the plaintiffs' negligence claims against Jailer Strode.

### A. Summary judgment in favor of Jailer Strode

The district court granted summary judgment in favor of Jailer Strode on the plaintiffs' claims of negligence and gross negligence for failure to train the deputy jailers on the EMS policy and for failure to enforce the EMS policy. The court determined, relying on one of its own prior cases, *Walker v. Davis*, 643 F. Supp. 2d 921, 933–34 (W.D. Ky. 2009), that the EMS policy did not address the Jailer's supervision of that policy, and the manner in which the Jailer

supervises and enforces the EMS policy is discretionary in nature, warranting a grant of qualified official immunity to the Jailer on the state-law claims.

Plaintiffs renewed their opposition to summary judgment in favor of Jailer Strode when, after trial, they filed a motion for a new trial against all defendants under Federal Rule of Civil Procedure 59(a)(1). The plaintiffs argue that we should review *de novo* the district court's decision to grant summary judgment to Jailer Strode, citing *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 837 (6th Cir. 2013), a summary judgment case. We construe plaintiffs' motion for a new trial as raising both a request for reconsideration of the court's pretrial order granting summary judgment to Jailer Strode and a request for a new trial against the other defendants on the ground that plaintiffs did not receive a fair trial against them due, in part, to the court's earlier dismissal of the claims against Jailer Strode. We review the district court's grant of summary judgment to Jailer Strode *de novo*, and we limit our review to the record before the district court at the time it made its decision. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009); *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005). Our review leads us to conclude that the district court erred in applying the law when it granted summary judgment in favor of Jailer Strode.

In *Hedgepath v. Pelphrey*, 520 F. App'x 385 (6th Cir. 2013), a similar jail death case, this court was presented with an interlocutory appeal from the denial of qualified official immunity to several defendants, including supervisory jailers. The court ruled, based on "well-settled" Kentucky law, that although a supervisor's decision "on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." *Id.* at 391 (citing *Yanero v. Davis*, 65 S.W.3d 510, 529 (Ky. 2001)). Similarly, the court held, "the supervision of employees is a ministerial act when it merely involved enforcing known policies." *Id.* (citing *Yanero*, 65 S.W.3d at 522). The court affirmed the denial of qualified official immunity to the supervisory jailers on the claims that they failed to train deputy jailers on the jail policy and failed to enforce the policy. We agree with the reasoning of *Hedgepath* and adopt it to resolve this appeal.

*Hedgepath* was decided in the time period between the district court's grant of summary judgment to Jailer Strode and the start of the jury trial. In the motion for a new trial, the

plaintiffs argued that *Hedgepath* entitled them to a trial against Jailer Strode, and they also distinguished *Walker*, the case relied on by the district court to grant summary judgment to Jailer Strode. In summarily denying the new trial motion, the court did not address *Hedgepath* or revisit its reliance on *Walker*. We conclude this was error.

In *Walker*, the district court granted immunity to a county sheriff on the ground that the plaintiff failed to point to any policy that required the sheriff to supervise the enforcement of a police pursuit policy in any particular manner. 643 F. Supp. 2d at 933–34. In this case, by contrast, the plaintiffs pointed to the jail's training policy, which specifically provided that "[t]he Jailer . . . shall establish and monitor each employee's training and fitness to help ensure satisfactory performance." Further, the EMS policy provided that "[a]ll officers are trained to respond to medical emergencies since an inmate's life may depend on appropriate first aid." Thus, *Walker* is inapposite, while *Hedgepath* and *Yanero* lead us to conclude that the district court erred in granting the Jailer qualified official immunity on the negligence claims brought against him under Kentucky law.

Strode contends that *Hedgepath* is wrongly decided because "*Yanero* does not stand for the proposition that Jailer Strode's training on and enforcement and supervision of the EMS policy are ministerial." Appellees' Br. at 39. He relies on *Rowan County v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006), to support the proposition that a Jailer's training, management, and supervision of jail staff are discretionary tasks.

The *Hedgepath* court rejected a similar argument when it explained that "[t]he distinction between cases like *Haney* [*v. Monsky*, 311 S.W.3d 235 (Ky. 2010)] and *Sloas*, which focus on the discretionary duty to anticipate prospective harm, and cases like *Yanero* and *Jones* [*v. Lathram*, 150 S.W.3d 50 (Ky. 2004)], which focus on the ministerial duty to follow instructions, is critical to the analysis in this case." 520 F. App'x at 390. *Hedgepath*'s claim, like the plaintiffs' claim in this case, was "that the contents of the policy were decided and that the Supervisory Jailers simply failed to train the jailers on how to comply with those policies. Because this claim implicates a ministerial duty, the District Court's denial of qualified immunity will be affirmed." *Id.* at 391–92. When Jailer Strode decided on the content of the EMS Policy, he performed a discretionary act. But the question remains whether Strode

negligently performed his ministerial duties to train the deputy jailers to follow the written EMS policy and to enforce the policy as written.

Because Jailer Strode was not entitled to qualified official immunity for his ministerial acts, the district court erred in granting summary judgment in his favor.  The plaintiffs are entitled to a trial on their negligence claims against Jailer Strode.

Strode offers a final argument that reversal is not warranted because the jury has already resolved the pertinent factual issues.  He points to the jury's "no" answer to the question:  "Do you believe from the evidence that Warren County failed to adequately train its deputy jailers; that the policy-makers of Warren County can reasonably be said to have been deliberately indifferent to the need for such training; and that this failure was a substantial factor in causing Mr. Finn's death?"  This question asked the jury to report its decision on the plaintiffs' § 1983 claim against Warren County and its policymakers.  The question did not ask the jury to decide whether Jailer Strode was negligent or grossly negligent for failing to train the deputy jailers on the EMS policy or for failing to enforce the EMS policy.  The court had no reason to submit such questions to the jury because the court granted Strode qualified official immunity on the negligence claims before trial.

For all of these reasons, we reverse the grant of qualified official immunity to Jailer Strode and remand the case to the district court for a trial on the plaintiffs' negligence claims against him.

## B.  Judgment as a matter of law for the deputy jailers

We next consider the plaintiffs' challenge to the jury verdict in favor of the deputy jailers. We review *de novo* the district court's denial of the plaintiffs' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012).  We view the evidence in the light most favorable to the deputy jailers who prevailed at trial, and we may grant the motion only if there was no genuine issue of material fact for the jury and reasonable minds could reach only one conclusion—in favor of the plaintiffs. *See id.*  We may not at this stage make decisions on the credibility of the witnesses, weigh the

evidence, or substitute our own judgment for that of the jury. *See Berry v. City of Detroit*, 25 F.3d 1342, 1347 (6th Cir. 1994).

The district court correctly ruled that genuine issues of material fact existed for the jury's determination on whether the deputy jailers were liable in negligence or gross negligence. The jury read the EMS policy, heard the witnesses testify, and determined that the deputy jailers did not act negligently. Taking all of the evidence in the light most favorable to the deputy jailers, the court did not err in denying the plaintiffs' Rule 50(b) motion because reasonable minds could not reach only one conclusion, in favor of the plaintiffs, based on the trial evidence.

We do not agree that the plaintiffs proved negligence *per se* or negligence and are entitled to judgment in their favor. The plaintiffs point to KRS 441.045(1), which provides: "The county governing body shall prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners, provided such rules are consistent with state law." Subsection (2) of the statute provides that "[w]illful violation of the rules promulgated pursuant to subsection (1) of this section shall be deemed a violation." Although the parties agree that no Kentucky court has addressed what this statute means by "willful" violation, they consulted various definitional sources to reach the conclusion that "willful" means "intentionally" or "purposefully."

According to the plaintiffs, the district court determined before trial that the deputy jailers' duties under the EMS policy were ministerial in nature; at trial, the deputy jailers admitted that they knew Finn was experiencing alcohol withdrawal, yet all of them conceded that they failed to notify an EMT, doctor, or nurse of Finn's condition as the policy required. Because the proof shows a willful violation of KRS 441.045(1), plaintiffs argue, KRS 446.070 allows them to recover damages from the offender for that willful violation. We do not agree.

First, the plaintiffs frame the trial facts in their favor, while our task is to consider the trial evidence in the light most favorable to the prevailing deputy jailers. Although plaintiffs portray the testimony as a series of admissions in their favor, we view the evidence as presenting classic factual issues for jury determination on the elements of negligence: duty, breach, injury, and legal causation. *See Wright v. House of Imps., Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

Second, even if the facts had been completely in plaintiffs' favor, and they were not, the plaintiffs did not establish negligence *per se* under KRS 446.070.  When proving negligence *per se*, the common-law negligence standard of ordinary care is replaced with a statutory or regulatory standard of care.  *Wright*, 381 S.W.3d at 213.  The plaintiffs admit that a statutory violation of any regulation for the "comfort and treatment of prisoners," *see* KRS 441.045(1), requires purposeful or intentional conduct.  Plaintiffs can prevail on the negligence *per se* theory only if the factual record is viewed in a light most favorable to them and also read to prove that each deputy jailer admitted he failed to follow the EMS policy.  Because the law requires us to consider the facts in the light most favorable to the deputy jailers and the record does not support the determination that each of them admitted a failure to follow the EMS policy, the plaintiffs cannot prevail on this theory.  Further, this court has previously held under Kentucky law that a prison's internal operating procedure "is not a regulation from which negligence for violation should arise *per se*."  *Flechsig v. United States*, 991 F.2d 300, 304 (6th Cir. 1993).  To hold that it is would "create a disincentive" and cause the jail "to adopt as procedures only what is legally required."  *Id.*

The parties presented the jury with disputed facts on the claims against the deputy jailers and the jury resolved those disputes in favor of the jailers.  The district court did not err in denying the plaintiffs' Rule 50(b) motion on this ground.

## C.  Warren County's failure to train the deputy jailers

Plaintiffs next argue that the district court should have granted their Rule 50(b) motion on the § 1983 failure-to-train claim against Warren County.  Plaintiffs contend they are not required to prove the deliberate indifference of any deputy jailer before they can hold the county liable on a failure-to-train theory, citing *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985).  In addition, they take the position that they proved Warren County failed to provide adequate training for its deputy jailers.

The plaintiffs waived this issue at trial by agreeing that the district court should instruct the jury that the failure-to-train claim is derivative of individual liability on a deliberate indifference claim.  *See United States v. Olano*, 507 U.S. 725, 732 (1993).  Counsel pronounced

to the court:  "I'm comfortable with a derivative instruction theory on the failure to train."  R. 233 Page ID 3984.  In light of this express waiver, we will not consider the issue on appeal.

**D.  Testimony of Dr. Alan Weder**

Plaintiffs next argue that the district court should have excluded the testimony of defendants' medical expert, Dr. Alan Weder, because he did not state in his pretrial expert report that his opinions were stated to a reasonable degree of medical certainty.  When the plaintiffs objected to Dr. Weder's testimony at trial, the court ruled that the witness would be limited to the opinions he had disclosed in his expert report and the court assumed that Dr. Weder would state his opinions to a reasonable degree of medical certainty.  When defense counsel confirmed that Dr. Weder would do so, the court allowed the testimony.  In his testimony before the jury, Dr. Weder expressed his opinions to a reasonable degree of medical certainty.

Plaintiffs now argue, relying on *Vance v. United States*, 182 F.3d 920 (6th Cir. 1999) (unpublished table opinion), that Dr. Weder's failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(i) should have precluded his testimony.  *Vance* is distinguishable because the physician in that case stated he had "a strong circumstantial basis" to believe something.  In this case, the correct standard for expert witness testimony—a reasonable degree of medical certainty—was used.[1]

Plaintiffs further contend that Dr. Weder's testimony violated Kentucky law, which provides that "a tortfeasor 'takes the claimant as he finds him and is entitled to neither credit nor setoff against the amount of the claimant's damages because of preexisting physical conditions which make the claimant more susceptible to injury, or to greater injury, than would have been the case with better health.'"  *Morgan v. Scott*, 291 S.W.3d 622, 640–641 (Ky. 2009).  Based on *Morgan*, the plaintiffs requested an "eggshell skull" instruction after Dr. Weder testified.  The

---

[1]We observe, however, that Dr. Weder's testimony likely was subject to a challenge for lack of reliability, *see* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), but the plaintiffs did not raise this issue below or on appeal.  It appears to us that Dr. Weder merely speculated that Finn died of a congenital heart condition rather than delirium tremens.  In line with *Daubert*, we have explained that the "knowledge" requirement of Rule 702 requires the expert to provide more than a subjective belief or unsupported speculation. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).  The doctor's mere statement that the opinion is given to a reasonable degree of medical certainty "does not make a causation opinion admissible.  The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Id.* at 671 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

court gave such an instruction at the conclusion of the case, although it was not worded precisely as the plaintiffs had requested.  Even if we assume that this damages instruction should have been drafted in the language the plaintiffs proposed, reversal is not warranted.  The jury found in favor of the defendants on the issue of liability and did not reach the issue of damages.  Consequently, the "eggshell skull" instruction could not have influenced the jury's verdict, and we affirm.[2]

## E.  Compound interrogatories to the jury

Finally, the plaintiffs contend that the interrogatories submitted to the jury did not conform to the ones they proposed, which would have directed a verdict on liability in plaintiffs' favor as to the deliberate indifference of Warren County and the negligence of the deputy jailers.  Although the plaintiffs argue that the compound interrogatories given to the jury complicate a review of the record, we conclude that there was sufficient differentiation in the interrogatories between the concepts of deliberate indifference and negligence for the jury to understand the questions put to them and for us to understand the jury's verdict.  We affirm on this issue.

## III.  CONCLUSION

Having carefully reviewed the proceedings in the district court, we conclude that summary judgment should not have been granted in favor of Jailer Strode on the negligence claims against him.  We therefore REVERSE the grant of summary judgment to Jailer Strode and REMAND the case to the district court for a trial on the plaintiffs' negligence claims against him.  In all other respects, we AFFIRM the judgment of the district court.

---

[2]We comment briefly on another jury instruction issue that was not raised below or on appeal.  The elements instruction relating to the § 1983 claim did not properly instruct the jury on the subjective component of deliberate indifference, which is equivalent to "recklessly disregarding" the risk of harm.  *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994).  Instead, the instruction told the jury that it could find deliberate indifference if it determined that the deputy jailer "intentionally refused or failed to take reasonable measures to address Mr. Finn's serious medical need."  R. 215 Page ID 2714.  The instruction then added that "[m]ere negligence or a lack of reasonable care on the part of the deputy jailer does not constitute deliberate indifference."  *Id.* As written, the instruction erroneously mixed the concepts of intentional and negligent conduct without ever instructing the jury on reckless disregard.