**Gregory R. VINCENT, Administrator of the Estate of Shannon Ray Finn, deceased; Sandra Roddy, Guardian of S.N.F., J.W.F., and G.R.F., minor children of Shannon Ray Finn, deceased, Plaintiffs–Appellants,**

v.

**WARREN COUNTY, KENTUCKY, et al., Defendants,**

**and**

**Jackie Strode, Individually and in his official capacity as the Jailer of the Warren County Regional Jail, Defendant–Appellee.**

No. 15–5048.

United States Court of Appeals, Sixth Circuit.

Oct. 28, 2015.

BEFORE: CLAY and STRANCH, Circuit Judges; BLACK, District Judge.*

OPINION

STRANCH, Circuit Judge.

This is the second appeal brought in a case concerning the 2009 death of Shannon Ray Finn in the Warren County Regional Jail in Bowling Green, Kentucky. In the first appeal, we reversed the district court's grant of summary judgment in favor of Warren County Jailer Jackie Strode on the ground of qualified official immunity, but we affirmed the district court on all other issues. *Finn v. Warren Cnty.*, 768 F.3d 441, 444 (6th Cir.2014). On remand, Jailer Strode again moved for summary judgment, arguing that the negligence claims against him are precluded by the jury's findings at the previous trial. The district court granted the motion, prompting this second appeal. For the reasons we explain below, we again REVERSE the grant of summary judgment in favor of Jailer Strode and REMAND the case to the district court with an instruction to conduct a jury trial on the plaintiffs' negligence and gross negligence claims against Jailer Strode.

* The Honorable Timothy Black, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND

The facts of the case are set forth in our prior opinion, *Finn*, 768 F.3d at 444–48, so we summarize only those details necessary to this decision. On March 20, 2009, Shannon Finn died in the Warren County Regional Jail during the course of alcohol withdrawal. *Id.* at 444. Upon admission to the jail three days earlier, Finn did not show any signs of alcohol withdrawal, but his symptoms developed the following day. *Id.* at 445. On-site licensed practical nurses, employed by Southern Health Partners (SHP) to provide health care to inmates under a contract with Warren County, performed a few perfunctory medical assessments and administered some oral medications to Finn, but they failed to contact SHP's Medical Director for the jail, Dr. John Adams, to obtain orders for further medical treatment. *Id.* at 445–447. Finn's condition worsened to delirium tremens, and deputy jailers eventually found him dead in his cell. *Id.* at 445–48.

Finn's late father, Johney E. Finn, as administrator of Finn's estate, and Sandra Roddy, as guardian of Finn's three minor children, filed suit against Warren County, Jailer Strode, six deputy jailers, SHP, Dr. Adams, and two SHP nurses.[1] *Id.* at 444. The complaint asserted federal constitutional claims under 42 U.S.C. § 1983 and state-law negligence claims. *Id.* The district court granted summary judgment in favor of Strode, holding that he was entitled to qualified official immunity on the negligence claims against him. *Id.* at 448. The court also dismissed some other parties and claims before trial. *Id.* at 444. A jury ultimately returned verdicts in favor of all remaining defendants. *Id.* On appeal, we reversed the district court's ruling that Strode was entitled to qualified official

immunity on the negligence claims, but affirmed on all other issues. *Id.* at 448–53.

In our opinion, we observed that the parties presented testimony of medical experts who expressed contradictory opinions about "whether Finn received proper medical care, whether the alcohol withdrawal treatment protocol written by Dr. Adams provided for appropriate medical care, and whether Finn's life could have been saved if he had been transported to a hospital." *Id.* at 447. We also noted that the parties "presented the testimony of jail experts who offered different opinions on whether the jail's written Emergency Medical Services Policy (EMS) was adequate and whether the deputy jailers followed the EMS policy." *Id.*

The EMS policy states:

Emergency medical services are available 24 hours a day to inmates of the Warren County Regional Jail to ensure prompt emergency medical attention. All officers are trained to respond to medical emergencies since an inmate's life may depend on appropriate first aid. Emergency medical ... care shall be available to all inmates commensurate with the level of such care available in the community.

*Finn v. Warren Cnty.*, No. 1:10–cv–00016, R. 185–1 (W.D.Ky.). The policy mandates that "drug or alcohol withdrawal" suffered by an inmate "shall constitute an emergency and [its] presence will initiate the Medical Emergency Care Plan." *Id.* The Medical Emergency Care Plan instructs the deputy jailer to give immediate first aid to the inmate, "[t]elephone the Emergency Transport Unit ... [c]all for assistance from other Detention Officers/law enforcement" and "[t]elephone the Emergency

---

1. After Johney Finn's death, Gregory Vincent was substituted as the administrator of Finn's estate and the lead plaintiff in this case.

Room." *Id.* A different section of the policy directs "[t]he officer confronted with a medical emergency" to "call the EMT, *Doctor,* or Nurse, in accordance with the Medical Emergency Care Plan ... and relay the emergency information," and "comply with the facility's Nurse, *Doctor* or EMT instructions." *Id.* (emphasis in original).

We recognized in our prior opinion that Strode offered pivotal trial testimony on whether the deputy jailers' failure to follow the mandatory requirements of the EMS policy proximately caused Finn's death:

> ... Strode testified that jail policy prohibits admission of an arrestee to the jail if that person appears to be experiencing an emergency medical condition. Because the jail's EMS policy defines an emergency as "drug or alcohol withdrawal," Strode confirmed that Finn would not have been admitted to the jail if he had shown any symptoms of alcohol withdrawal at the time he was booked into the jail. The arresting officer would have taken Finn to a nearby medical facility for treatment before he was admitted to the jail.
>
> ... *Strode explained that he does not want the deputy jailers to make medical judgments so he wrote the EMS policy to outline simply and clearly the jailers' responsibilities. Although the written EMS policy requires jailers to take particular actions in a medical emergency—and alcohol withdrawal is defined in the policy as a medical emergency— Strode repeatedly testified that the jailers were obligated only to report the medical emergency to SHP medical staff, and the medical staff had the responsibility to decide whether to transport the inmate to a hospital.*
>
> ... Strode told the jury, "[W]hat I've learned from this is that the policy I had

in place, I did a poor job of trying to convey that, trying to write that out, and I will take the blame for that, that it was a poor job of putting down instructions." R. 209 Page ID 2662.

*Id.* at 447–48 (emphasis added).

We reversed the district court's grant of qualified official immunity to Strode because his alleged failure to enforce the EMS policy through supervision and training of the deputy jailers implicated a ministerial function for which Kentucky law provides no immunity. *Id.* at 449–50. Finding the plaintiffs "entitled to a trial on their negligence claims against Jailer Strode," we remanded the case to the district court "for a trial on the plaintiffs' negligence claims against him." *Id.* at 450.

On remand, Strode again moved for summary judgment, arguing that any claim of negligence against him had to be "derivative of a finding of negligence on the part of the deputies," but the jury did not find the deputies negligent. *Finn*, No. 1:10–cv–00016, R. 270–1. Because the jury determined that the deputy jailers were not negligent, Strode argued that he could not be found negligent as a matter of law. *Id.* Without citing any cases, the district court agreed with Strode's reasoning in a short order and granted summary judgment in his favor. We have jurisdiction of this appeal under 28 U.S.C. § 1291.

## II. ANALYSIS

Reviewing *de novo* the district court's grant of summary judgment, *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir.2015), we again reverse and remand this case with an instruction to conduct a jury trial on plaintiffs' negligence claims against Strode. Because the plaintiffs seek to hold Strode liable *for his own alleged negligence*, summary judgment should not have been granted on the

ground that any negligence of Strode is derivative of the deputy jailers' negligence.

To establish common law negligence under Kentucky law, the plaintiffs must prove by a preponderance of the evidence: "(1) a duty of care owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Readnour v. Gibson*, 452 S.W.3d 617, 620 (Ky.Ct.App.2014). Strode does not dispute that he, as Jailer of Warren County, owed a duty of care to provide Finn with emergency medical services. By statute, Kentucky places an obligation on the county to "prescribe rules for the . . . comfort and treatment of prisoners," and to bear the costs of "providing necessary medical . . . care for indigent prisoners in the jail." Ky.Rev.Stat. Ann. § 441.045(1) & (3) (West 2015). *See also Sudderth v. White*, 621 S.W.2d 33, 35 (Ky. Ct.App.1981) (recognizing Jailer's statutory duties to prisoners in his custody); *Hall v. Midwest Bottled Gas Distrib., Inc.*, 532 S.W.2d 449, 452–53 (Ky.Ct.App.1976) (discussing Jailer's duty to keep inmates safe from unnecessary harm); *Ratliff v. Stanley*, 224 Ky. 819, 7 S.W.2d 230, 232 (App. 1928) (observing that the "law imposes a duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody"). In accordance with these authorities recognizing the Jailer's duty to inmates, Strode drafted an EMS policy that acknowledged the jail's duty to provide 24–hour emergency medical care to inmates. There is further no dispute that the third element of negligence is satisfied because Finn suffered a fatal injury during his confinement at the jail.

■ With two of the four elements of negligence undisputed, two critical fact issues remain for a jury's determination. One issue is whether Strode breached his ministerial duty to enforce the EMS policy through supervision and training of the deputy jailers to insure that they follow the policy. If the plaintiffs prove that issue, the second is whether Strode's breach of his ministerial duty was a legal cause of Finn's death. *See Readnour*, 452 S.W.3d at 620. Whether Strode's failure to enforce the EMS policy was a legal cause of Finn's death is a different question from whether the deputy jailers' breach of a duty of ordinary care, reasonable in the circumstances, was a legal cause of Finn's death.

When we previously determined that Strode is not entitled to qualified official immunity on the negligence claims against him, we relied on settled Kentucky law to characterize the discretionary and ministerial functions Strode performed. *Finn*, 768 F.3d at 449 (relying on *Hedgepath v. Pelphrey*, 520 Fed.Appx. 385, 391–92 (6th Cir.2013); *Yanero v. Davis*, 65 S.W.3d 510, 522–29 (Ky.2001)). We concluded that Strode engaged in a discretionary function when he created and drafted the EMS policy, but we marked as ministerial Strode's responsibility to enforce the EMS policy. *See Osborne v. Aull*, No. 2010–CA–001073–MR, 2012 WL 3538276, *6 (Ky.Ct.App. Aug. 17, 2012) (denying qualified official immunity to Jailer where his obligation to enforce existing medical policies and protocols was a ministerial act and a question of fact remained for trial on whether the Jailer enforced the policies and protocols).

Two days after we issued our prior decision in *Finn*, the Supreme Court of Kentucky confirmed our understanding of state immunity law in *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky.2014). Qualified official immunity protects a government official from suit for his conduct in setting policy or exercising judgment, but not when he engages in a purely ministeri-

al act. *Id.* at 296. "The distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions." *Id.* at 297. Thus, Strode's promulgation of the EMS policy was a discretionary function; his enforcement of the policy's terms—his "giving orders to effectuate" the policy—was ministerial. *See id.* Whether Strode's ministerial act was performed properly is a question reserved for the jury. *See id.; Finn,* 768 F.3d at 450.

Strode contends that the pertinent factual issues have already been decided by the *Finn* jury. The verdict form required the jury to answer, as to each deputy jailer, the following compound question: "Do you believe from the evidence that [deputy jailer's name] failed to exercise ordinary care, as was reasonable under the circumstances, in his care and treatment of Mr. Finn *and* that the failure was a substantial factor in causing Mr. Finn's death?" R. 217, Page ID 2736–38 (emphasis in original). The jury answered "no" to this question for each deputy jailer. *Id.* Strode asserts that if the deputy jailers did nothing wrong, he did nothing wrong and the plaintiffs cannot now relitigate whether the deputy jailers were negligent.

█ For issue preclusion to bar subsequent litigation, the issue raised in the second case must have been raised, actually litigated and decided, and necessary to the court's judgment in the first case. *Yeoman v. Commonwealth of Ky.,* 983 S.W.2d 459, 465 (Ky.1998). Because Strode initially was granted qualified official immunity, the *Finn* jury was not asked to decide whether he should be found liable for his own negligence in failing to enforce the EMS policy. *Finn,* 768 F.3d at 450. Therefore, the issue of Strode's personal negligence was not raised, actually litigat-

ed and decided, and necessary to the court's judgment in *Finn.*

Moreover, a jury hearing the same evidence that was presented in the *Finn* trial could reasonably find that Finn died of delirium tremens and that his life could have been saved if Strode had required the deputy jailers to call emergency medical services immediately upon presentation of the medical emergency, as mandated by the EMS policy. *See Finn,* 768 F.3d at 447 (observing plaintiffs' medical expert offered an opinion that Finn would have survived if he had received emergency medical care at a hospital). It is the jury's province to evaluate any conflicts in Strode's testimony about the EMS policy, particularly in light of the mandatory language Strode used when he drafted the policy. For instance, in *Finn,* Strode testified that he wrote the EMS policy to outline simply and clearly the deputy jailers' responsibilities when an inmate presented an emergency medical situation because he did not want the deputies to make medical judgments. *Id.* at 447. Yet, contrary to mandatory language in the EMS policy, he repeatedly testified that the deputy jailers were required only to report the inmate's medical emergency to SHP staff. *Id.* at 447–48. Whether Strode breached his ministerial duty to enforce the EMS policy's terms is a factual question the *Finn* jury had no occasion to decide.

The parties debate whether the jury's finding that the deputy jailers were not negligent precludes further litigation against Strode. It does not. While we affirmed the jury verdict in favor of the deputy jailers, we viewed the trial evidence through a highly deferential lens as required by Federal Rule of Civil Procedure 50(b). *Id.* at 450. That standard required us to review the evidence in the light most favorable to the prevailing deputy jailers

and barred us from granting the motion unless we could conclude there was no genuine issue of material fact for the jury and reasonable minds could reach only one conclusion in favor of the plaintiffs. *Id.* Applying this high bar and recognizing that the jury had heard conflicting evidence on material issues of fact, we affirmed.

Inherent in Strode's current preclusion argument is his insistence that the *Finn* jury decided the deputy jailers did not breach a duty owed to Finn under the EMS policy. We were not asked to address this precise issue in the *Finn* opinion, although we briefly rejected a different issue raised by the plaintiffs concerning whether the compound interrogatories sufficiently distinguished between deliberate indifference under § 1983 and state-law negligence. *Id.* at 453. Having now considered Strode's preclusion argument, we conclude that the jury's unexplained negative answers to the compound interrogatories do not unequivocally confirm that the jury found no breach of duty.

We first consider an unpublished Kentucky Court of Appeals opinion that approved similar verdict form interrogatories in a medical malpractice case where the plaintiff challenged the jury instructions as giving undue prominence to some facts or issues. *Dornbusch v. Miller,* Nos. 2011–CA–001354, –001358, & –001380, 2013 WL 4710327, at *11 (Ky.Ct.App. Aug. 30, 2013). There, the court gave an instruction on breach of duty, but supplied the jury with a verdict interrogatory that combined breach of duty with legal causation and underlined the conjunction "and" joining the two elements together. *Id.* The Court of Appeals concluded that the jury was not confused or misled; instead, the verdict clarified "that the jury could not impose liability unless it found from the evidence that all the elements of negligence were met." *Id.* That statement might have force if the jury had answered "yes" to both breach of duty and causation and then awarded damages. But in *Dornbusch,* as in *Finn,* no damages were awarded to the plaintiffs, and it cannot be determined whether the jury answered "yes" to one part of the interrogatory and "no" to the other or "no" to both parts.

Jurors may become confused by compound interrogatories in verdict forms, as demonstrated by a question the *Dornbusch* jury submitted to the trial court during deliberations. *Id.* at *12. The jury asked: "If question part 'A' has a majority of yes votes but question part 'B' has a majority of no votes can we award damages solely on part 'A'?" *Id.* (internal quotation marks omitted). In essence, the jury asked if it could award damages if it found breach of duty, but no legal causation. The *Dornbusch* opinion does not tell us how the trial court responded to the jury's question. *Id.* But the Court of Appeals summarily concluded that the interrogatories served their intended purpose and did not "give undue emphasis" to an aspect of the case favorable to one side over the other. *Id.*

The district court in *Finn* read its instructions to the jury without explaining the verdict form in any detail. The court's Instruction No. 4 on the negligence claims against the deputy jailers read in part:

You are instructed that it was the duty of each of these jailers to exercise ordinary care in their care and treatment of Mr. Finn while he was in their custody.

"Ordinary care" means such reasonable care as you would expect an ordinary prudent person to exercise under similar circumstances. In deciding whether ordinary care was exercised in this case, the conduct in question must be viewed in the light of all the sur-

rounding circumstances, as shown by the evidence in the case.

If you believe from the evidence that a jailer failed to comply with this duty and that such failure was a substantial factor in causing Mr. Finn's death, you may find for the Plaintiffs. Otherwise, you should find for the jailer.

*Finn,* No. 1:10–cv–00016, R. 215, Page ID 2720. Notably, the court did not tie the issue of the deputies' duty to exercise ordinary care to any specific action or inaction of the deputies, including the failure to follow the EMS policy. *Id.* Rather, the court instructed the jury to consider "all the surrounding circumstances." *Id.* After reading the instructions, the court directed the jury to complete the verdict form by answering the questions listed under each defendant's name. *Id.,* R. 215; R. 234, Page ID 145. The jury did not ask the court any questions during the deliberations, and the court did not ask the jury to explain the verdicts it returned. *Id.,* R. 234, Page ID 148.

From our perspective, we cannot tell whether the jury answered "no" to the verdict interrogatories because it found no breach of duty, no legal causation, or both. *See Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89–93 (Ky.2003) (discussing the distinct legal concepts of duty and causation). One potential scenario is that the jury answered "no" because it found the deputy jailers breached the ordinary standard of care, but the plaintiffs failed to prove causation. Another scenario—a legal impossibility far harder to imagine—is that the jury answered "no" because it found the deputy jailers did not breach the ordinary standard of care, but the plaintiffs proved causation. A third scenario—the one Strode prefers—is that the jury found the plaintiffs failed to prove both breach and legal causation. The completed verdict form does not tell us how the

jury reached the decision to answer the interrogatories "no."

Consequently, we find the reasoning of *Dornbusch* unhelpful and draw support instead from the more analogous precedent of *Hilsmeier v. Chapman,* 192 S.W.3d 340, 343–44 (Ky.2006). There, the Supreme Court of Kentucky acknowledged the Commonwealth's long history of using " 'bare bones' jury instructions," but held that certain instructions were erroneous because they failed "to provide the jury the opportunity to specify whether its findings of liability were based on undue influence, unsound mind, or both." The court cautioned that "instructions may not be so vague or diluted as to obscure the jury's findings," and they "must be sufficiently clear to reveal precisely the jury's conclusions[.]" *Id.* at 344. "Blending separate and distinct legal propositions in the same instruction is bad form and it is much better practice to incorporate each proposition in a separate instruction." *Id.* (internal quotation marks omitted). The same reasoning applies to interrogatories included in a verdict form.

The lack of clarity in the *Finn* verdict prevents us from accepting Strode's argument that the jury necessarily found that the deputy jailers did not breach a duty of care owed to Finn. Because we cannot be certain that this particular issue was resolved in the deputies' favor, the doctrine of issue preclusion does not bar the plaintiffs from litigating whether Strode's failure to enforce the EMS policy through his supervision and training of the deputies constituted negligence. Further, as we stated in *Finn,* the only verdict interrogatory that addressed training of the deputy jailers related to the § 1983 claim against Warren County. *Finn,* 768 F.3d at 450. The jury had no opportunity to decide whether Strode breached a duty by failing to train the deputies to follow the EMS

policy and if he did, whether the failure to train was the legal cause of Finn's death.

Finally, Strode draws his derivative liability theory from the unpublished decision of *Burton v. Waters*, Nos. 2003–CA–001170–MR, 2003–CA–001845–MR, 2004 WL 2150986 (Ky.Ct.App. Sept. 24, 2004). *Burton* is distinguishable. In that case, a police officer stopped a vehicle in which Burton was a passenger, but the officer failed to arrest the driver for operating under the influence and allowed him to proceed. *Id.* at *1. A short time later, Burton was injured in a car accident. *Id.* He sued the officer and the City of Lebanon, the officer's employer, for negligence. *Id.* The Court of Appeals affirmed dismissal of the claims because the officer did not owe a duty of care to Burton as a passenger in the vehicle and there was no special relationship between the officer and Burton. *Id.* Observing that the City's potential liability was derivative of the officer's liability, the Court of Appeals found "no basis for the City's liability" because the claim against the officer was correctly dismissed. *Id.*

Here, by contrast, Strode owed Finn an undisputed duty under state law to provide prompt and necessary medical care. Ky. Rev.Stat. Ann. § 441.045(1) & (3) (West 2015). A special relationship existed, moreover, because Finn wholly depended on his custodian for his care and protection. Even reading the *Finn* verdict as Strode might prefer, a jury could still find in this case that Strode breached *his* duty of care to Finn by failing to fulfill his ministerial duty to enforce the EMS policy and that his failure to do so was the legal cause of Finn's death.

In light of our reasoning, we need not again address the plaintiffs' arguments that the outcome of the *Finn* trial might have been different if Dr. Alan Weder had not been permitted to give his expert opinion about the medical cause of Finn's death.

## III.  CONCLUSION

For all of the reasons explained above, the district court erred in granting Jailer Strode's second motion for summary judgment following our remand in *Finn*. Accordingly, we REVERSE the grant of summary judgment and we REMAND the case to the district court with an express instruction for the court to conduct a jury trial on plaintiffs' negligence claims against Strode.