RENDERED: SEPTEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-001897-MR

THREE FORKS REGIONAL
JAIL; HARVEY PELFREY
INDIVIDUALLY AND IN HIS CAPACITY
AS JAIL ADMINISTRATOR OF
THREE FORKS REGIONAL JAIL; AND
THE FOLLOWING INDIVIDUALLY AND AS
AGENTS, EMPLOYEES AND/OR
REPRESENTATIVES OF THREE FORKS
REGIONAL JAIL: JULIE ADAMS, CONNIE
PERRY, JEROD GRIFFITH, JONI HAYES,
EMORY CRAWFORD, JOSHUA WARD,
AMANDA STAMPER, CHARLOTTE CONDY,
ANDREA COLLINS, JONATHAN HARRIS,
DAVID CAUDILL, AND RONALD DICKERSON          CROSS-APPELLANTS


                    CROSS-APPEAL FROM LEE CIRCUIT COURT
v.                  HONORABLE MICHAEL DEAN, JUDGE
                    ACTION NO. 15-CI-00105


JIMMY VANOVER; ROBERT
FUGATE; AND THE ESTATE OF
RICKY COMBS, BY AND THROUGH
CONNIE HOLLAN,
ADMINISTRATRIX                               CROSS-APPELLEES

AND                                NO. 2019-CA-000306-MR


THE ESTATE OF RICKY COMBS,
BY AND THROUGH CONNIE
HOLLAN, ADMINISTRATRIX                                 APPELLANT


                    APPEAL FROM LEE CIRCUIT COURT
v.                  HONORABLE MICHAEL DEAN, JUDGE
                       ACTION NO. 15-CI-00105


HARVEY PELFREY, INDIVIDUALLY
AND IN HIS CAPACITY AS THE JAIL
ADMINISTRATOR OF THREE
FORKS REGIONAL JAIL; THREE
FORKS REGIONAL JAIL; AND THE
FOLLOWING INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES, AGENTS AND/OR
REPRESENTATIVES OF THREE
FORKS REGIONAL JAIL:  JULIE
ADAMS, CONNIE PERRY, JEROD
GRIFFITH, JONI HAYES, EMORY
CRAWFORD, JOSHUA WARD,
AMANDA STAMPER, CHARLOTTE
CONDY, ANDREA COLLINS,
JONATHAN HARRIS, DAVID
CAUDILL, RONALD DICKERSON;
JIMMY VANOVER; AND
ROBERT FUGATE                                          APPELLEES


-2-

AND                 NO. 2019-CA-000507-MR

THREE FORKS REGIONAL
JAIL; HARVEY PELFREY
INDIVIDUALLY AND IN HIS
CAPACITY AS THE JAIL ADMINISTRATOR OF
THREE FORKS REGIONAL JAIL; JULIE ADAMS,
INDIVIDUALLY AND IN HER CAPACITY
AS AN AGENT, REPRESENTATIVE, AND NURSE
OF THREE FORKS REGIONAL JAIL; AND
THE FOLLOWING INDIVIDUALLY AND IN THEIR
CAPACITY AS AGENTS, REPRESENTATIVES, AND
EMPLOYEES OF THREE FORKS
REGIONAL JAIL:  CONNIE
PERRY, JEROD GRIFFITH, JONI HAYES,
EMORY CRAWFORD, JOSHUA WARD,
AMANDA STAMPER, CHARLOTTE CONDY,
ANDREA COLLINS, JONATHAN HARRIS,
DAVID CAUDILL, AND RONALD DICKERSON      CROSS-APPELLANTS


CROSS-APPEAL FROM LEE CIRCUIT COURT
v.            HONORABLE MICHAEL DEAN, JUDGE
ACTION NO. 15-CI-00105


THE ESTATE OF RICKY
COMBS, BY AND THROUGH
CONNIE HOLLAN,
ADMINISTRATRIX; JIMMY
VANOVER; AND ROBERT
FUGATE                            CROSS-APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; MAZE AND K. THOMPSON, JUDGES.

CLAYTON, CHIEF JUDGE:  Ricky Combs, an inmate of the Three Forks Regional Jail (hereinafter "the Jail"), suffered a ruptured spleen in an altercation with another inmate and died several days later.  His Estate brought suit against the Jail, the Jail administrator, and several employees of the Jail, claiming they negligently failed to prevent the fight and fatally delayed in obtaining medical treatment for Combs.  The Lee Circuit Court granted summary judgment to the Jail on the grounds of sovereign immunity and to the other defendants in their official capacities.  It determined that the administrator and employees were not entitled to individual immunity, however, because genuine issues of material fact existed regarding whether they had violated their ministerial duties in controlling and supervising the inmates and providing reasonable medical treatment to Combs.  The circuit court denied summary judgement on the individual capacity claims.  The Estate brings this interlocutory appeal from the circuit court's opinion and order, arguing that the Jail is not entitled to any form of immunity.  The defendants have cross-appealed, arguing they are entitled to qualified official immunity.

-4-

## Background

Combs was an inmate of the Jail in 2015 when he was involved in a fight with one or two other inmates. According to Melvin Newton, Jr., an inmate with whom Combs shared a cell, the altercation was "just a push and a shove" in which Combs fell from a bed onto the floor. Combs did not experience any physical symptoms immediately following the fight, nor was it reported to the correctional officers. Over the course of the next few days, however, Combs complained of feeling unwell, running a fever, sweating, stomach pain and cramping, feeling that his kidneys were shutting down, and difficulty using the bathroom. Newton claimed that in the three days preceding his death, Combs made ten to fifteen requests for medical help to correctional officers Emory Crawford and Jerod Griffith and to the kitchen supervisor, Charlotte Condy. Newton recalled that approximately two days before his death, Combs told Officer Crawford he needed to go to the doctor. His complaints were apparently ignored.

On Saturday, July 4, 2015, Combs's symptoms worsened. Because it was a holiday weekend, Harvey Pelfrey, the Jail administrator, was not present. Nurse Julie Adams, a salaried employee of the Jail, was also not present. Nurse Adams worked regular hours at the Jail from Monday to Friday and was available

by telephone for consultation at all other times. Her assistant, Joni Hayes,[1] who did not have any type of nursing certification, was also not present at the Jail that day. The Jail also had a contract for medical services with a physician, Dr. Derrick Hamilton, who was not regularly present at the Jail but could be contacted at any time.

Early that morning at pill call, Newton told Officers Crawford and Griffith that Combs needed help because he was sick and curled up in the fetal position. Officer Griffith said he was first made aware of Combs's medical complaints that morning, contradicting Newton's claim that Combs had already asked Griffith for help during the previous three days. Combs told Griffith he was experiencing left-sided abdominal pain and cramping. Griffith said he informed the acting captain, Connie Perry, of these complaints at around 6:45 a.m. Perry was serving as the acting captain that day because the regular captain was on vacation. According to Perry, no one informed her that she would be acting captain that day or what she was required to do in that position. The other correctional officers simply decided she should serve as acting captain because she had been employed the longest at the Jail.

---

[1] Hayes's first name is spelled "Joanie" in her deposition and "Joni" in the notice of appeal and elsewhere in the record. We have adopted the latter spelling for the sake of consistency.

According to Officer Griffith, Captain Perry told him she was already aware of Combs's complaints because he had made similar complaints to her and Nurse Adams on the previous day during pill call. Newton claims Griffith and Crawford told him that the nurse had been called, told them Combs was fine, and that the officers were not going to do anything but keep him in the cell. Griffith, on the other hand, testified he was not aware of anyone calling Nurse Adams that morning. Nurse Adams testified that the Jail did not contact her about Combs's condition until about 6:00 p.m. that evening.

At around 9:00 a.m., Newton had to help Combs to the bathroom because he was unable to go on his own and he fell off the commode. As Combs's condition continued to worsen, Newton and his fellow inmates yelled and banged on the cell windows to get the attention of the Jail employees. According to Pelfrey, the Jail administrator, and to the specific terms of the Jail's own policies and procedure, this was an acceptable method for the inmates to alert the employees to a medical emergency.

At some time between 1:30 p.m. and 2:30 p.m., correctional officer Jonathan Harris radioed to the booking area that an officer needed to respond to Combs's cell. Officers Griffith and Crawford and acting Captain Perry heard the request but did not respond because they were busy dealing with someone in the booking area. Officer Harris followed up with a phone call and told Griffith that

the inmates were requesting an officer to check on Combs. Griffith responded by telling Officer Harris, who was a new employee, to turn off the television and microwave to the cell. Newton claimed that switching off the television was retaliation for the inmates' disturbance whereas Griffith testified it was turned off for safety and security reasons.

When Officers Crawford and Griffith came to the cell they found Combs "hunkered over" on his bed holding his left side, complaining of abdominal pain. They took him to the medical cells in the booking area. According to Newton, they had to drag Combs down the hallway because he was unable to walk on his own. Griffith described Combs as being in such severe pain he had to be assisted. According to Newton, he was subsequently punished for trying to get help for Combs by being placed in solitary confinement for fifteen days.

Officers Griffith and Crawford stated that Combs's vital signs (blood pressure and oxygenation) were normal when he was brought to the medical area of the Jail. Combs told them he had blood in his stool two days before and had not had a bowel movement since. Griffith placed Combs in a cell for medical observation and strip searched him for contraband. He observed a palm-sized bruise on his right hip. Griffith again reported Combs's complaints to Captain Perry, who told him the nurse had instructed them to give Combs two Tylenol and to keep him under observation for any change in his condition. Combs said he was

feeling better after taking the Tylenol, asked to be returned to his cell and apparently ate lunch. Griffith stated he continued to check on Combs whom he described as seeming to "do okay" until a little after 5:55 p.m. when Griffith left because he was needed in the booking area. When he returned he found Combs on his hands and knees in front of the door, claiming he could not breathe and his chest was hurting. According to Griffith, Combs appeared to be in a great deal of pain and his vital signs were erratic.

At around the same time, correctional officers Amanda Stamper and Captain Josh Ward arrived for their 6:00 p.m. shift. Stamper described Combs as shouting that his side hurt and he could not breathe. She observed a large bruise on his left side. Officer Griffith described Combs as having a grayish appearance and a cold clammy feeling. Captain Perry called Nurse Adams and reported that Combs's oxygen statistics were not registering and his blood pressure was 200/100. The nurse immediately told Perry to call 911.

Combs lost consciousness approximately two minutes before EMS arrived. Captain Ward asked David Caudill, another corrections officer who had just arrived for his shift, to relieve Officer Harris, who accompanied Combs. Combs died in the ambulance a short time later before reaching the hospital.

According to Dr. John Hunsaker, III, a forensic pathologist and the medical examiner who performed an autopsy on Combs, Combs suffered from a

delayed rupture of the spleen. Dr. Hunsaker opined that some trauma caused the spleen to rupture and bleed, clot, and resume bleeding until eventually it burst and continuously bled. He described the typical symptoms of a delayed ruptured spleen as pain in the upper left abdomen, shortness of breath, possible chest pain, collapse, and eventual loss of consciousness. Dr. Hunsaker agreed that a layperson would not typically recognize the symptoms of a delayed ruptured spleen. He testified that it could be revealed by medical examinations such as X-rays, CT scans, or an MRI. Dr. Hunsaker stated that a ruptured spleen can be successfully treated by replacing any lost blood and then surgically removing the spleen. He opined that Combs died of hypovolemic shock caused by his vital organs not getting enough blood due to blood loss from the ruptured spleen.

Dr. Preston Miller, a general surgeon at Wake Forest University who practices mainly in traumatic surgery, and was retained as an expert by the Estate, also testified he would not expect a layperson to be able to recognize the signs and symptoms of a ruptured spleen because this diagnosis requires evaluation by a physician. Often, he explained, a person with a ruptured spleen will have normal vital signs, such as blood pressure and oxygen saturation level, which would make it difficult for a layperson to determine what was wrong. Dr. Miller reviewed Combs's case and opined that if he had been evaluated earlier by a medical professional, even as late as 2:45 p.m. when he was taken to the observation cell,

he could have been diagnosed, appropriately treated, and would likely have survived.

At the time of Combs's death, the Three Forks Regional Jail Policies & Procedures Manual, revised in October 2013, stated: "You [the inmate] will receive all necessary medical and mental health care as prescribed in KRS [Kentucky Revised Statutes] 441.045. The jail staff will take every effort to ensure that your rights are protected and that you are safe from harm."

KRS 441.045(1) provides that "[t]he county governing body shall prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners, provided such rules are consistent with state law. The county judge/executive may inspect the jail at any reasonable time." The statute thereafter sets forth the allocation of responsibility among the federal government, the state, counties, cities and the inmates for expenses incurred in the necessary medical, dental, and psychological treatment of inmates. "Necessary care" is defined by the statute as "care of a nonelective nature that cannot be postponed until after the period of confinement without hazard to the life or health of the prisoner." KRS 441.045(10).

Under a section entitled MEDICAL PROCEDURES, the Manual provides:

Medical treatment is given under KRS 441.045, Section 10. For the purpose of this section, "Necessary Care" means care of a non-elective nature that cannot be postponed until after your release from jail without hazard to life or health. . . . No inmate shall be refused necessary health care that cannot wait until the end of his or her incarceration. . . . In order to be seen by the medical staff for any non-emergency issues you must fill out a "Sick call request." These forms may be turned in anytime to the walk officer. Medical staff will perform sick call as needed on a 24 hr basis.

For routine medical complaints, the Manual directs inmates to fill out a "Sick Call Request" form. It explains that "[t]he walk officer will read your request to determine if your complaint needs immediate attention." Then, the on-duty nurse "will evaluate your medical condition to determine if you need further evaluation by the jail doctor."

In the event of a medical emergency, the Manual directs inmates to "push the call button in the cell" or "utilize the intercom system." The Manual further states: "You may also beat on the window and door to attract attention of an officer. Frivolous or fraudulent emergencies may result in disciplinary actions."

The Manual also states:

a. Inmates shall be informed verbally at the time of admission the method of gaining access to medical care or medical services in the jail. All Three Forks Regional Detention Center inmates shall be entitled to health care. Medical Care of the facility shall be delivered under the direction of a licensed physician. No deputy Jailer shall

ever arbitrarily deny an inmate's request for medical services.

1. A deputy Jailer or the Jailer shall take inmates to contracted doctors.

2. Emergency treatment is available at all times through the Kentucky River Regional Medical Center emergency room.

. . .

b. The Jail Jailers and all deputy Jailers shall be trained, and be certified, by the appropriate agency in first aid and all deputy Jailers shall be trained in CPR.

Under the section entitled Emergency Medical/Dental/Psychiatric Care, the Manual provides that "Emergency medical/dental/psychiatric care shall be available at all times to all inmates[,]" and lists the following occurrences as constituting an emergency:

1. Severe bleeding

2. Unconsciousness or seizures

3. Serious breathing difficulties

4. Serious head injury

5. Serious burn

6. Serious pain

7. Serious suicide attempt

8. Sudden onset of bizarre behavior

9. Health or life threatening situation

10. Severe alcohol or drug withdrawal

When a deputy jailer is confronted with an emergency, the Manual states the deputy jailer "shall immediately administer first aid and notify the shift commander. The shift commander shall make the decision whether to transport the inmate to the emergency room or doctor's office or call the contracted physician for instructions."

The Manual provides that "Jail personnel shall have current training in standard first aid equivalent to that provided by the American Red Cross, American Heart Association, or an equivalent nationally recognized organization. New jail personnel shall receive training within their first year of employment." Further, "Jail personnel shall be certified to perform CPR (Cardiopulmonary Resuscitation), equivalent to that provided by the American Red Cross, American Heart Association, or an equivalent nationally recognized organization. New jail personnel shall receive certification within their first year of employment."

In addition to these provisions relating to medical care of inmates, the Manual contains a list of duties and job requirements for employees relating to supervision of inmates. Employees are required to check the cells regularly to monitor the condition of the inmates and their activities and to supervise the

inmates during recreation, visitation, library, and all scheduled daily or weekly functions.

In his deposition, Harvey Pelfrey, the Jail administrator, described himself as the main supervisor of the Jail, answerable to the Board which meets monthly. Directly beneath him is his Chief of Security, Keith Combs. Under Combs are the captains, then four sergeants per captain and then the correctional officers. He testified that the correctional officers receive all their training from the Kentucky Department of Corrections. When questioned about the Manual, he explained that he did not write it and personally did not have anything to do with it except hiring a former Deputy Commissioner to update it. He testified that he has familiarized himself with the Manual but did not personally know if new inmates are informed about access to medical care. He was asked: "If a correctional officer receives some medical complaints and doesn't know what exactly the problem is with the inmate, is that a situation where the nurse should be contacted to assess the inmate?" He replied: "They should call the nurse if they are not sure." He also testified that any Jail employee can contact the nurse directly if the nurse is not present, adding, "Usually the captain will unless they are involved helping an inmate but any of them can."

When he was questioned about why Connie Perry was the acting officer on the day Combs died, he replied that he did not know if it was a policy of

the Jail that the senior officer would take charge if there wasn't a captain on duty but explained it was "something we did in-house." He further testified that captains don't receive any additional training but are chosen based on his experience of them. He testified that he had no idea if he had told Perry anything beyond she should call him or Keith Combs if she had problems.

Cam Lindsey, a former federal prison warden and jail administration expert with a long history of working in corrections, evaluated the case as an expert for the Estate. He opined that the Jail administrator and staff breached their duties to Combs as they are defined by the policies and procedures of the Jail, by statute, by professional correctional standards, and by the Kentucky Constitution. In Lindsey's opinion, the Jail staff's failure to follow the Jail policies resulted in Combs's death. Specifically, he stated that Jail staff had no discretion when it came to addressing medical complaints, which should be immediately referred to a medical professional. Further, in Lindsey's view, Pelfrey failed to clearly delineate a chain of command at the Jail which resulted in Connie Perry being appointed as captain by the correctional officers themselves, even though she had no training or experience as a captain. He opined that the Jail staff present on the day of Combs's death was not qualified to determine what type of medical treatment he needed and should have immediately contacted a medical professional

rather than delaying treatment and turning off the TV to Combs's cell as punishment for the inmates banging on the windows to get their attention.

By contrast, according to Donald Leach, a corrections expert retained by the defendants, the care and custody of Combs met acceptable correctional practice as expected by a reasonable corrections administrator. He opined that Combs was provided with the appropriate level of medical care based upon the information he provided custody staff, and that when the staff became aware Combs was experiencing a serious medical need, they took appropriate action. In his view, the Jail and its staff complied with the Kentucky Department of Corrections Jail Standards for training, for providing a policy and procedure manual, and with the requirement for the provision of medical care, including conducting sick calls five days per week and emergency services when the need was identified.

The complaint filed by Combs's Estate alleged that Combs was physically beaten as a result of the defendants' failure to properly supervise and control the Jail inmates. The complaint further alleged that his requests for medical attention following the beating were either ignored or inadequately addressed and that the beating caused him pain and suffering and ultimately resulted in his death. The complaint included claims of negligence, gross negligence, recklessness, and wanton conduct; violation of the Jail's own policies

and procedures; violation of Sections 1, 2, 10, 11, 12, and 17 of the Kentucky Constitution; violation of the Kentucky Civil Rights Act and other provisions of the Kentucky Revised Statutes, including Chapter 441; violations of the United States Constitution; and violations of the Kentucky Administrative Regulations (KAR).

The named defendants, in addition to the Jail itself, were Harvey Pelfrey; the Jail administrator; Julie Adams, the nurse; Joni Hayes, the nurse's assistant; Charlotte Condy, the kitchen supervisor; and the following correctional officers: Connie Perry, Joshua Ward, Amanda Stamper, David Caudill, Jerod Griffith, Emory Crawford, Andrea Collins, and Jonathan Harris. The complaint also named as defendants Dr. Ronald Dickerson, the coroner, and Jimmy Vanover and Robert Fugate, the inmates allegedly involved in the fight with Combs. The individual defendants were named officially and also in their individual capacities as employees, agents, and/or representatives of the Jail.

Following extensive discovery, the defendants filed a motion for summary judgment in which they argued that the Jail and its employees in their official capacity were entitled to sovereign immunity, that the Jail employees were entitled to qualified official immunity for the claims against them in their individual capacities, and that the Estate had failed to prove the Jail was negligent. The Estate responded that the defendants were not entitled to any form of

immunity and that a genuine issue of material fact existed regarding the negligence of the Jail and its employees.

The trial court entered an opinion and order in which it granted the defendants' motion for summary judgment insofar as the claims against the Jail and the claims against the Jail employees in their official capacities were barred by sovereign immunity. It found that genuine issues of material fact existed as to whether Jail officials and employees violated Jail policies and procedures and applicable laws and regulations in their control and supervision of the inmates, and in providing medical treatment to Combs. It characterized these duties as ministerial and consequently denied summary judgment on the grounds of qualified immunity as to all the claims against the defendants in their individual capacities.

**Standard and Scope of Review**

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996) (citing Kentucky Rules of Civil Procedure (CR) 56.03). Generally, the "denial of a motion for summary judgment is . . . not appealable because of its interlocutory nature[.]" *Transportation Cabinet, Bureau of Highways, Com. of Ky. v. Leneave*, 751 S.W.2d

36, 37 (Ky. App. 1988). An important exception is "an order denying a substantial claim of absolute immunity [which] is immediately appealable even in the absence of a final judgment." *Breathitt County Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009). This is because the cloak of immunity entitles its possessor to be free "from the burdens of defending the action, not merely just an immunity from liability." *Rowan County v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006) (citations omitted). Whether a defendant is entitled to "immunity is a question of law . . . , which we review *de novo*." *Id*. at 475 (citations omitted).

The extent of our review in this type of appeal is strictly circumscribed. It is limited "to the issue of immunity, and no substantive issues." *Baker v. Fields*, 543 S.W.3d 575, 578 (Ky. 2018). The reason for this is that "[o]therwise, interlocutory appeals would be used as vehicles for bypassing the structured appellate process." *Id*. The Kentucky Supreme Court has specifically held "that an appellate court reviewing an interlocutory appeal of a trial court's determination of a defendant's immunity from suit is limited to the specific issue of whether immunity was properly denied, nothing more." *Id*. Thus, we are not permitted to address the parties' arguments regarding the underlying merits of the case because it would exceed our appellate jurisdiction, which is strictly limited to determining the availability of the defenses of sovereign, governmental and/or qualified immunity. *Maggard v. Kinney*, 576 S.W.3d 559, 566 (Ky. 2019).

**Analysis:  The Availability of Immunity Defenses**

**a) The Jail**

With these principles in mind, we turn to the Estate's first allegation that the trial court erred in holding that the Jail and, by extension, its employees in their official capacities were entitled to the absolute defense of sovereign immunity.  The Estate contends that the Jail is an agency that is entitled to immunity only insofar as it is performing a governmental, as opposed to a proprietary, function.  Housing inmates and providing medical treatment, the Estate contends, are the types of undertakings that private businesses engage in for profit and consequently the Jail is not shielded by immunity in this case.

It is undisputed that "[s]overeign immunity affords the state absolute immunity from suit[.]"  *Transit Authority of River City v. Bibelhauser*, 432 S.W.3d 171, 173 (Ky. App. 2013).  Similarly, "[c]ounties, which predate the existence of the state and are considered direct political subdivisions of it, enjoy the same immunity as the state itself."  *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009) (citing *Lexington-Fayette Urban County Government v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004)).

Below the level of the state and the counties, immunity extends to governmental and quasi-governmental agencies and departments, but only if it can be shown the entity in question was (1) established by an immune entity and (2)

performs a "function integral to state government." *Id.* at 99-100. Governmental immunity "does not extend, however, to agency acts which serve merely proprietary ends, *i.e.*, non-integral undertakings of a sort private persons or businesses might engage in for profit." *Prater*, 292 S.W.3d at 887.

The establishment of jails in Kentucky is governed by Chapter 441 of the Kentucky Revised Statutes. KRS 441.025(1) mandates that "[t]he fiscal court of each county shall provide for the incarceration of prisoners arrested in the county or sentenced or held by order of the courts in the county." The statute permits the fiscal court to provide and maintain a jail facility that complies with the health and safety standards defined in KRS 441.055 or it may contract "with another county or a city for the incarceration and care of its prisoners[.]" KRS 441.025(2)(a)-(c).

Elsewhere in Chapter 441, provision is made for two or more counties by ordinances to establish a regional jail authority. KRS 441.800(1). Such an authority "shall constitute a public body corporate and politic, **exercising public and essential governmental functions**, and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this section[.]" KRS 441.800(2) (emphasis added). KRS 441.810(1) provides that "[t]he regional jail authority shall be composed of members appointed by the county judges/executive of the respective counties within the authority and the

-22-

jailer of the county where the regional jail is located. The county judge/executive of the most populous county shall appoint three (3) members to the authority, and the remainder of the county judges/executive shall each appoint two (2) members."

According to the motion for summary judgment, Three Forks Regional Jail was established under KRS 441.810 as a regional jail for Lee, Breathitt, Wolfe, and Owsley Counties. The Articles of Incorporation state that the Jail is an entity under the authority of a Board whose members are appointed by the Judges Executive of Lee, Wolfe, and Owsley Counties. The board of the Jail is composed of six members, two from each of those counties. A permanent position on the board is held by the elected jailer of Lee County, due to the Jail's geographic location in Lee County.

The question of whether the Jail is entitled to sovereign immunity appears to be resolved definitively by *Bryant v. Pulaski County Detention Center*, 330 S.W.3d 461, 465 (Ky. 2011), *as modified* (Feb. 25, 2011). In that case, an inmate of the Pulaski County Detention Center who was injured on work detail sued the Detention Center but failed to name the Detention Center Corporation as a party. The Kentucky Supreme Court ruled that although the trial court erred in refusing to allow him to amend his complaint to add the Corporation, the error was harmless because the Corporation was shielded by sovereign immunity. The Supreme Court stated that the Pulaski County Detention Center Corporation was

"bonded, built and holds title to the Detention Center property only to provide incarceration space for inmates who have been charged with or convicted of breaking the law and are serving a penalty in the county jail. Its only identity is to serve as a tool of county government, which furthers the state purpose of incarcerating lawbreakers." *Id.* at 465. It concluded that the Corporation was entitled to summary judgment as a matter of law on the basis of sovereign immunity because it was an alter ego of the county. *Id*.

The Jail in this case holds a position analogous to that of the Pulaski County Detention Center Corporation, as its only identity is to serve as a tool of county governments which established it. The Estate argues, however, that the *Bryant* Court actually intended to use the term "governmental" rather than "sovereign" immunity in reference to the Detention Center Corporation, and that the Jail is not entitled to sovereign immunity nor to governmental immunity because it was engaged in a proprietary function. As evidence for this, the Estate points to the *Bryant* Court's reliance on *Autry v. Western Kentucky University*, 219 S.W.3d 713 (Ky. 2007). In *Autry*, Western Kentucky University and the University's Student Life Foundation, which was created to build and operate the university's student dormitories, were found to be entitled to governmental immunity. In its analysis, the *Bryant* Court equated the relationship between the Pulaski County Detention Center and the Detention Corporation to that existing

between the University and the Student Life Foundation, describing the position of the Detention Center Corporation as "on all fours" with the Student Life Foundation described in *Autry*. *Bryant*, 330 S.W.3d at 465.

The Kentucky Supreme Court has acknowledged that the terms governmental and sovereign immunity are often used interchangeably, because governmental immunity is itself an extension of sovereign immunity. *Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 845 (Ky. 2019). Governmental immunity "is based in the concept that 'sovereign immunity should "extend . . . to departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administration organization and structure."'" *Id*. at 845-46 (citations omitted).

Under this reasoning, the Jail is entitled to immunity because it is an integral part of state government. First, the Jail was established pursuant to statute by a group of undeniably immune entities: the named counties. Although the Estate argues that there is a distinction between a county detention center and a regional detention center and that sovereign immunity cannot extend to regional detention centers, it provides no support for this contention. There appears to be no substantive difference for purposes of the immunity analysis between a detention center established by one county or a Jail established by multiple counties. *See Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 229 (Ky. 1989).

The *Bryant* Court's characterization of the Pulaski County Detention Center Corporation as "a tool of county government, which furthers the state purpose of incarcerating lawbreakers" applies equally to the Jail in this case. *Bryant*, 330 S.W.3d at 465. "[T]here can be no doubt that the operation of a county jail is a government function. No one suggests that a jail, a state prison, or federal penal institution can be operated by the private sector without governmental consent, contract, and regulation." *City of Louisville Bd. of Zoning Adjustment v. Gailor*, 920 S.W.2d 887, 889 (Ky. App. 1996).

The Estate argues that housing and providing medical care for inmates is the sort of proprietary undertaking in which private businesses engage; it refers specifically to the numerous jails in Kentucky which hire private, for-profit corporations to provide medical services to inmates. The Jail itself is required to pay for the medical treatment of inmates outside the facility and contracts with a doctor to perform medical treatment. The Estate contends that "[w]hen the Jail's non-medical staff took it upon themselves to attempt to perform medical evaluations and services for Combs, rather than have medical professionals perform these evaluations, they were engaging in a proprietary function and consequently neither the Jail nor its employees in their official capacity are entitled to governmental immunity." Appellant's Brief, p. 24. But the fundamental claim against the Jail concerns the failure to procure professional medical assistance for

-26-

Combs in a timely manner in accordance with the Jail's own policies and procedures and the related claim that the administrator failed to train Jail personnel to follow the policies and procedures in obtaining such assistance promptly. When the staff allegedly failed to procure medical assistance, their inaction did not alter the fundamentally governmental nature of the Jail.

Operating a jail is a quintessentially governmental function which encompasses providing security and medical care to the inmates. Although a jail may contract with private individuals or entities to provide medical care to inmates, it is not automatically converted into a proprietary enterprise when it does so. The provision of these services is integral to the function of the Jail and does not transform it from a governmental entity into a proprietary one.

**b) The Individual Defendants in their Official Capacities**

Because the Jail is entitled to sovereign or governmental immunity, its officers and employees are entitled to official immunity in their representative capacities. "[W]hen an officer or employee of the state is sued in his/her representative capacity, . . . his/her actions are included under the umbrella of sovereign immunity[.] Similarly, when an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled[.] *Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001). "If a state

-27-

agency is deemed to have governmental immunity, its officers or employees have official immunity when they are sued in their official or representative capacity." *Autry*, 219 S.W.3d at 717. Simply because these officers or employees may have performed their duties in a negligent manner, as alleged in the complaint, does not divest them of official immunity in their representative capacity.

**c) The Defendants in their Individual Capacities**

Finally, the Jail defendants argue that the trial court erred in ruling that qualified official immunity was not available to Pelfrey and the Jail employees in their individual capacities. The complaint alleged negligence against the defendants not only for their alleged failure to provide timely medical care for Combs but also for their alleged failure to prevent the altercation with other inmates which led to Combs's injury.

"[W]hen sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522 (citation omitted). "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, . . . ; (2) in good

faith; and (3) within the scope of the employee's authority." *Id.* (citations omitted).

Conversely, "[a] government official is not afforded immunity from tort liability for the negligent performance of a ministerial act." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016), *reh'g denied* (Aug. 24, 2017). A ministerial duty is defined as one that "requires only obedience to the orders of others." *Id.* (citations omitted). A duty is ministerial "when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* A ministerial duty does not, however, always involve "the simple rote application of a set of rules." *Id.* It may require "ascertainment of . . . facts," and an officer may be permitted "some discretion with respect to the means or method to be employed[.]" *Id.* (citations omitted).

### i)The Jail Administrator

The trial court ruled that although a Jail official's decision regarding the contents of the Jail's emergency medical services policy was a discretionary function, his duty to train his employees to follow the policy was ministerial. We agree with the trial court's analysis, which is fully consonant with our case law. Pelfrey's adoption and dissemination of the Jail's Policies & Procedures Manual was a discretionary function. Our state's highest court has repeatedly stated that "[p]romulgation of rules is a discretionary function; enforcement of those rules is a

ministerial function." *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 150 (Ky. 2003) (citing *Yanero*, 65 S.W.3d at 529); *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014).

But Pelfrey's duty to supervise and train his employees to follow the rules is ministerial. In *Finn v. Warren County, Kentucky*, 768 F.3d 441 (6th Cir. 2014), an opinion relied upon by the trial court, the court held that although a supervisor's decision "on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." *Id.* at 449 (citations omitted).

The Jail defendants argue that Pelfrey cannot be held vicariously liable for the allegedly negligent acts of his employees or for negligent hiring. But Kentucky law does recognize that an employer can be held liable for the negligent supervision, training, or insufficient training of its employees. *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291 (Ky. App. 2009). Thus, although Pelfrey may invoke the defense of qualified official immunity as to the contents of the Jail Manual, it does not serve to protect him from claims that he was negligent in training his employees to be familiar with the contents of the Manual relating to inmate safety and medical care.

### ii) The Jail Employees

As to the Jail employees, the trial court held that their actions or inactions in carrying out the Jail's policies and procedures for the supervision of inmates and the provision of medical treatment were ministerial. Its decision is supported by the Kentucky Supreme Court's consistent holding that the general supervision of students by teachers is ministerial in nature "as it requires enforcement of known rules." *Patton*, 529 S.W.3d at 727.

Supervision of students is not ministerial when the official is given "little or no direction or guidance on how the supervision was to be performed." *Id*. (citing *Haney v. Monsky*, 311 S.W.3d 235 (Ky. 2010); *Sloas*, 201 S.W.3d 469). In *Sloas*, a case relied upon by the Jail defendants, a deputy jailer was tasked with supervising a group of six inmates on work detail cutting down trees and brush by the roadside. He was provided with no guidance or clear directives beyond clearing the brush from the side of the road. The Court described his task as "he has to watch them, and try as best he can to anticipate what they might do, correct them as necessary, determine their capabilities, sometimes by asking them forthright whether they can or can't do the job, assign the duties and see that the work is performed." *Sloas*, 201 S.W.3d at 480. The deputy jailer was not provided with any clear directives or orders as to how to accomplish this complex and highly-discretionary task. By contrast, the Jail Policies & Procedures Manual

contained clear directives relating to the supervision and medical treatment of inmates. This is not a situation in which an officer was expected to perform a governmental act that was "not prescribed" or was left "without clear directive." *Patton*, 529 S.W.3d at 727.

Thus, in cases in which employees are properly trained regarding their supervisory duties, they are acting in a ministerial capacity. On the other hand, when the guidance is not clear, as in *Sloas*, employees may invoke qualified immunity. In this case, a question of fact remains as to whether the Jail employees were adequately trained by Pelfrey.

The Jail defendants argue that the altercation between Combs and his fellow inmates was not reasonably foreseeable and consequently the duty element of the negligence claim against the correctional officers could not be met. But this argument is directed to the sufficiency of the evidence supporting the claim of negligence, not to the availability of qualified official immunity. A similar question was addressed by the Kentucky Supreme Court in the context of a teacher supervising students:

> There is certainly the temptation to say that a person such as a teacher acts in a discretionary manner, so that he may have immunity from suit, when the ministerial act he is required to do—here supervision of bus duty—can have unexpected events occur. One might reason that it is impossible for a teacher to fully perform the ministerial duty of supervision of students because there are so many

things involved in that process that are beyond what the teacher can control. For example, if a teacher is working with a student on one side of the room, and on the other side of the room a student stabs his desk mate with a pencil, it could rightfully be argued that no teacher could prevent all harm from coming to the children in his care. But that does not mean his supervision duty was discretionary, such that he would have immunity from suit.

Instead, the ministerial duty of supervision must be viewed through the lens of negligence. It is possible that some acts that happen when a teacher is supervising are outside the scope of what his supervision requires, and he will be entitled to a summary judgment as a matter of law. Or, as with the pencil stabbing, the question may be whether the teacher was negligent in his supervision, and then the reasonableness of the teacher's actions will be taken into account. Certainly, there are *defenses* to the claim that a teacher (or any official) has breached his ministerial duty. But that does not mean such a claim is barred by immunity. The nature of the *acts* performed by the teacher, or any governmental employee, determines whether they are discretionary or ministerial.

Immunity is reserved for those governmental acts that are not prescribed, but are done, such as policy-making or operational decision making, without clear directive.

*Marson*, 438 S.W.3d at 301-02.

The Jail employees may well be found not to have acted negligently in supervising the inmates or in procuring medical assistance for Combs, but that does not mean the negligence claims against them are barred by immunity.

-33-

Finally, we turn to a brief consideration of the status of Dr. Dickerson, Nurse Adams, and her assistant, Joni Hayes. Dr. Dickerson is the coroner who performed the autopsy on Combs. He is not an employee of the Jail and did not have any contact with Combs before his death. The Estate makes no specific claims against him in his role as coroner. Whether any form of immunity is available to Dr. Dickerson was never directly addressed by the trial court. Although Dr. Dickerson is a named party to this appeal, his status for purposes of immunity will not be reviewed here because it was never addressed by the trial court.

Adams and her assistant Hayes were both employees of the Jail. There is some evidence in the record, in the deposition testimony of Officer Griffith, that Nurse Adams was made aware of Combs's complaints before July 4, 2015, although she testified that she was not informed of his condition until 6:00 p.m. that day, when she directed the correctional officers to immediately call 911. It is a central contention of the Estate's case that Combs was not evaluated by a medical professional at the Jail until after 6:00 p.m. on the date of his death. The Jail defendants argue no evidence was presented that either Adams or Hayes deviated from the appropriate standard of care. Because Nurse Adams and her assistant were both employees of the Jail, and no specific arguments have been made that they should be treated differently for immunity purposes than the other

-34-

employees, the trial court's holding regarding the availability of immunity to the Jail employees is applicable to them. Thus, they also are entitled to immunity in their official capacities but not in their individual capacities.

For the foregoing reasons, we affirm the Lee Circuit Court's order and opinion holding that (1) the Jail is protected by sovereign or governmental immunity; (2) the Jail employees in their official capacities are cloaked in the Jail's absolute immunity; and (3) the Jail officials and employees are not entitled to qualified official immunity.


ALL CONCUR.


BRIEFS AND ORAL ARGUMENT
FOR APPELLANT/
CROSS-APPELLEE ESTATE OF
RICKY COMBS:

L. Dustin Riddle
Salyersville, Kentucky

BRIEFS AND ORAL ARGUMENT
FOR APPELLEES/CROSS-
APPELLANTS:

Jason E. Williams
London, Kentucky